STATE OF NEBRASKA, APPELLEE, V. JOHN BYRON NEWMAN, APPELLANT.

541 N.W.2d 662

Filed January 2, 1996. No. A–94–833.

Dennis R. Keefe, Lancaster County Public Defender, and Webb E. Bancroft for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HANNON, IRWIN, and MILLER–LERMAN, Judges.

HANNON, Judge.

John Byron Newman appeals his conviction of first degree sexual assault, second or subsequent offense. A woman was sexually assaulted in her apartment while alone with her young child at night, and the issue at trial was the identification of Newman as her assailant. Newman alleges that the trial court erred in not suppressing evidence that the police obtained by a warrantless search of luggage they took from him when they arrested him, which search was not an inventory search; in admitting the testimony of two witnesses under Neb. Rev. Stat. § 27–404(2) (Cum. Supp. 1994); in not allowing him to read a voice exemplar to the jury without subjecting himself to general cross–examination; in allowing evidence of an identification from an allegedly suggestive photo lineup; and in finding the evidence sufficient to support the verdict. We conclude that Newman's luggage was unconstitutionally searched, but that the error in introducing the evidence obtained from the search was harmless, and that the trial court did not err in the other manners claimed. We therefore affirm.

## STATEMENT OF FACTS

In the early morning hours of March 22, 1993, the victim was home with her 3–year–old son. The victim lived in an apartment building in the 4600 block of Baldwin Avenue in Lincoln. The victim and her son were asleep in the living room, with the television on. The only other light on in the apartment was in the kitchen, which was accessible from the living room. In addition, there is an open cutout in the wall of the living room, through which one can see the kitchen. The victim testified that when the kitchen light is on she can see well enough to read in the living room without other lights in the living room. Lincoln police officer Robert Hurley testified at trial that he re–created the lighting as it was in the victim's apartment at the time of the assault and that although the light coming into the living room was less bright than it was when

one stood in the kitchen, it was still bright enough in the living room to read and to easily make out facial features and identify clothing.

At some point in the evening, the victim woke up after she heard a knock on her front door. The victim looked through the peephole in the front door, but did not see anyone. The victim testified that it was not unusual for a woman friend of hers to stop by her apartment late at night. The victim opened up the door part way and saw the defendant, Newman, standing outside. She asked Newman if he had the wrong apartment. He told her he did not have the wrong apartment. Newman pushed the door open and walked in. The victim began to back up and started kicking and hitting Newman. Newman backed the victim up against the couch in the living room.

Newman then pushed the victim down on the couch and began to remove the victim's clothing. The victim testified that she was wearing a green shirt, bra, jean shorts, underwear, a white T-shirt, and shoes and socks. After he had removed all her clothing, Newman lowered his pants and attempted to penetrate her vagina with his penis. The victim testified that Newman was not successful.

Newman then grabbed the victim in a "bear hug" and carried her into her bedroom. Newman threw the victim on the bed and penetrated her vagina with his finger. Newman then put a pillow over the victim's face because he was trying to muffle her crying. Newman again attempted to have sexual intercourse with the victim. The victim testified that all of a sudden, Newman stood up, turned off the light and began to say repeatedly, " 'This didn't happen.' " Newman began putting on his clothes, making sure the whole time that the victim's face was covered up.

The victim then heard a door shut, and she began to get up. Newman came back into the room and said, " 'I told you not to move.' " Newman pushed the victim down, covered her face over with a pillow, and then left. The victim got up, walked out into the front room, and observed that her son had been moved from the recliner in which he was sleeping to the couch. The victim tried to phone the police from her phone in the living room, but discovered that the phone cord had been cut. She also

discovered that the clothes Newman had taken off her and left on the floor were missing. The victim phoned the police from her phone in the kitchen. While she was still on the phone with the police dispatcher, the police arrived at her apartment at about 4 a.m. The victim testified that her ordeal lasted roughly 30 minutes.

When the police arrived, the victim described her assailant as a Hispanic male, between 5 feet 6 inches and 5 feet 8 inches tall, with dark hair, an olive complexion, and a moustache. The victim stated that the assailant was wearing a white T-shirt, black pants, and a black leather jacket. She did not describe the assailant's shoes. The victim told the police that she thought that her assailant might have had a slight accent, "because he was short with the words and things. He just sounded different than I'm normally used to."

Police conducted a search, using a dog to track the trail of the suspect leading from the victim's apartment. Lincoln police officer Paul Aksamit, a dog handler for the police department, took his tracking dog to the door of the victim's apartment and commanded that the dog begin tracking. The track headed around the various sides of the victim's apartment building, then northeast, across 47th Street, to an alley in which a dumpster was located. The dog stopped at the dumpster, and Officer Aksamit opened it up and found some clothing. The dog then continued eastward to a parking lot between some buildings in the 4700 block of Baldwin Avenue. The dog then lost the scent. Officer Erin Sims, who accompanied Officer Aksamit on the dog track, inspected the clothes in the dumpster. Officer Sims found a green print shirt, bra, underwear, socks, and jean shorts. At trial, the victim identified the clothing recovered by Officer Sims as the clothing she was wearing the night of her attack.

The police then took the victim to a hospital, where a "rape kit" was administered. The police then took the victim to the police station, where she was asked to use a computer to create a composite drawing of her assailant. She was then asked to look at a photo lineup and asked if she could identify her assailant from among the six photographs shown to her. She could not. The victim did point out, using the photographs for

demonstration, some of the features depicted in the photos which were similar to her assailant's features. Newman's photograph was not among the photographs in the photo composite.

The victim testified that on March 23, 1993, she was shown a second set of photographs, which again consisted of six photographs. The victim was asked whether she recognized her assailant from among the photographs. The victim did not identify any person depicted in the photograph as her assailant. Newman's photograph was not among the photographs shown to the victim.

On March 25, 1993, the victim was shown a third set of photographs, again consisting of six photographs. The police officer who showed the victim the photographs told the victim to take her time. The victim testified, "I knew immediately who it was, what number it was." Newman's photograph was No. 4 in the photographic array, and the victim identified his photograph as a picture of the man who attacked her. In court, the victim also identified Newman as the man who sexually assaulted her.

At about 12:15 a.m. on March 22, 1993, Russell Grady was sitting in his car, waiting to pick up Allen Wanek at 49th and Greenwood Streets, approximately seven blocks from the victim's apartment. Grady observed a woman walking north across Adams Street, along 49th Street. Following the woman shortly thereafter was a man Grady identified as Newman, walking about a quarter of a block behind. Grady stated that Newman was wearing a black leather jacket and white tennis shoes. Grady observed the woman walk north on 49th Street and then turn right on Greenwood Street, where she entered an apartment building in the middle of the block. When the woman got to the corner of 49th and Greenwood Streets, Grady testified, Newman ran to the corner and stopped. When the woman entered the apartment complex, Newman ran to the complex doors. Newman ducked down, looked up in the glass doors of the apartment complex, and then walked back to the sidewalk and looked at the building. When a light came on from an apartment in the right top corner of the building, Newman

walked away. Newman then walked back to 49th Street and walked south.

Grady testified that he drove around the block and proceeded to follow Newman because he thought Newman's behavior was unusual. Grady continued to observe Newman by circling around the next block and waiting for Newman to almost catch up with him. Grady testified that Newman walked to the corner of 49th Street and St. Paul Avenue, where he stood by a building on the corner. The building is approximately two blocks from the victim's apartment building. Grady said he continued to keep an eye on Newman while he looked for a patrol car which he had seen in the area. When he saw a patrol car going down Leighton Avenue, Grady drove after the patrol car. From the time he first observed Newman until the time he drove off after the patrol car, Grady testified, approximately 45 minutes had elapsed. When Grady caught up to the patrol car, he reported to the police officer what he had seen and then left.

A couple of days later, Grady was contacted at work by a Lincoln police officer who asked him to examine a photo lineup. Grady was unable to identify the photograph of the person he observed following the woman on March 22, 1993. A few days after that, Grady was shown a second set of photographs and was able to identify Newman's photograph as a picture of the man whom he observed on March 22.

Julie Denny testified that at approximately 10:15 p.m. on March 22, 1993, Newman approached her as she inspected her car in back of her apartment building in the 5200 block of Cleveland Avenue, approximately eight blocks from the victim's home. Denny stated that Newman was wearing a black leather jacket and white tennis shoes. Newman asked her whether she knew a Chinese couple that lived in the building, then followed her to some stairs. Newman asked Denny whether she was married and whether she had a boyfriend. Denny continued to walk toward her apartment. Denny reported the encounter to the police the next evening. On cross-examination, Newman asked Denny whether Newman had a Hispanic accent. Denny testified that she was sure he did not have an accent. Denny was asked by police to go to the station house, where she was asked to

create a composite drawing of Newman, using the police department's computer.

Finally, the State offered the testimony of Rev. Stewart Firnhaber, who testified that Newman came over to his house for dinner in early March 1993 and that he was wearing a black leather jacket and white tennis shoes. Newman asked Reverend Firnhaber on cross-examination whether Newman had a Hispanic accent. Reverend Firnhaber testified that he did not.

After the victim identified Newman as her assailant, Lincoln police determined that Newman had taken an Amtrak train to Las Vegas. On March 26, 1993, Lincoln police notified the police in Las Vegas that there was a warrant for Newman's arrest and that the State was requesting extradition. Newman was arrested by Las Vegas police at an Amtrak train station and brought to the Clark County, Nevada, detention center.

Newman filed motions to suppress the jacket and tennis shoes on the basis that they were recovered in violation of his Fourth Amendment rights and to suppress the photographic lineup evidence. At the hearing on those motions, the prosecution and Newman stipulated to the following facts: Immediately upon being arrested, Newman was frisked and then handcuffed. He possessed no contraband or weapons upon his person. Next to the ground where Newman had been standing were three suitcases. The suitcases were not inspected by the police, but remained unopened when they were placed in the trunk in the police cruiser in which Newman was transported to the detention center. Upon Newman's arrival at the detention center at about 8:50 a.m., the processing officer asked him if he had any valuables to declare. Newman responded that he did and listed the following on an "Inmate's Property Inventory and Release" form: a black wallet, two watches, a necklace, a $20,000 cashier's check, and bulk property, listed as three black bags. Newman signed the form underneath this statement.

In connection with that hearing, the prosecution and Newman further stipulated to the following facts: To Newman's knowledge, the bags were not opened or searched for inventory purposes. No warrant was sought or obtained to search the contents of the luggage. Entered into evidence at the hearing was a report by Sgt. Julie Goldberg of the Las Vegas

Metropolitan Police Department. The report states that after Newman's arrest, Las Vegas police contacted Lincoln police detective Richard Kohles, who asked whether Newman was wearing a leather jacket and white tennis shoes. Sergeant Goldberg told Detective Kohles no and described what Newman had been wearing upon his arrest. Detective Kohles then told Sergeant Goldberg that the black leather jacket and a pair of white tennis shoes were needed for evidentiary purposes. The report states,

> He was then explained that if he mentioned it, the property would have been taken earlier. However, at 1115 this same date, Detective M. Neumann . . . along with the reporting detective, arrived at the [Clark County Detention Center] and went to the property room. Contact was made. In the inventory, a black leather jacket and the white tennis shoes were found.

Newman and the State stipulated that Sergeant Goldberg and Detective Neumann retrieved Newman's black leather jacket and white tennis shoes from one piece of Newman's luggage located in the property room. The bags bore tags placed on them by the Las Vegas police which stated "BULK PROPERTY TAG."

The policy of the detention center is that if the three bags had not been searched by law enforcement officers prior to arrival at the detention center, the center's personnel would have looked through the luggage for contraband or weapons or explosives, and that there would have been no further inventory done, prior to placing the luggage in the property room. The trial court overruled Newman's motions to suppress. At trial, the State did not offer the shoes into evidence. The jacket was offered and received into evidence over an objection which preserved the question raised by that motion.

Newman also filed a motion in limine to bar the prosecution from offering the testimony of Grady and Denny, on the basis that their testimony was more prejudicial than probative. The motion in limine as to that testimony was denied, and the objection was preserved at trial.

At trial, the victim and Grady each identified the leather jacket seized from Newman's luggage as similar to the jacket

Newman was wearing on March 22, 1993. Lancaster County Deputy Sheriff Andrew Stebbing testified that he traveled to Las Vegas to pick up Newman, who had a number of items with him, which Stebbing brought back with Newman to Lincoln. In the Las Vegas police evidence locker was a brown paper bag, which contained a black leather jacket and some tennis shoes. The jacket identified by the victim and Grady as similar to Newman's was identified by Stebbing as the same jacket found in the Las Vegas evidence locker. Stebbing testified that he talked to Newman on the way back to Lincoln and that it was his opinion that Newman spoke with a Hispanic accent.

At the close of the State's case, Newman made a motion for a directed verdict, which was overruled. Newman then attempted to introduce a voice exemplar to prove that he did not have a Hispanic accent. The State objected, and its objection was sustained. Newman did not present any evidence.

Newman was convicted of the first degree sexual assault of the victim. Because the State produced evidence that he had committed two prior first degree sexual assaults, Newman's sentence was enhanced. Newman was sentenced to 25 to 50 years' incarceration, with credit for 497 days served, and is ineligible for parole.

## ASSIGNMENTS OF ERROR

Newman alleges the district court erred when it (1) overruled his motion to suppress evidence seized from his luggage, (2) overruled his motion in limine to bar the introduction of testimony from Denny and Grady, (3) held that Newman could not introduce a voice exemplar without subjecting himself to cross-examination, (4) barred him from introducing the voice exemplar and thus violated his due process rights, (5) overruled his motion to suppress the pretrial and courtroom identification of Newman because the photographic lineup was allegedly overly suggestive, and (6) found the evidence sufficient to support the verdict.

## STANDARD OF REVIEW

In determining the correctness of a trial court's ruling on a suppression motion, an appellate court will accept the factual determinations and credibility choices made by the trial

court unless, in light of all the circumstances, such findings are clearly erroneous. *State v. DeGroat*, 244 Neb. 764, 508 N.W.2d 861 (1993); *State v. White*, 244 Neb. 577, 508 N.W.2d 554 (1993). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Grimes*, 246 Neb. 473, 519 N.W.2d 507 (1994); *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994).

An appellate court reviews the admission of evidence of other acts under § 27-404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted. *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994).

Because exercise of judicial discretion is implicit in Neb. Rev. Stat. § 27-401 (Reissue 1989), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Carter, supra*.

## ANALYSIS

*Search of Newman's Luggage.*

Newman contends that the district court should have granted his motion to suppress the leather jacket seized from his luggage by the Las Vegas police and entered into evidence at trial. Newman alleged that the warrantless search of his luggage was outside the scope of an inventory search or a search subsequent to arrest, and therefore the jacket should have been suppressed as the fruit of an illegal search.

The Fourth Amendment to the U.S. Constitution protects people against unreasonable searches and seizures by the government, including by police officers. A search conducted pursuant to a warrant which was supported by probable cause is generally considered reasonable and therefore not violative of

the Fourth Amendment. *State v. Neely*, 236 Neb. 527, 462 N.W.2d 105 (1990). The U.S. Supreme Court has recognized, however, that " 'exigencies of the situation' " may sometimes make exemptions from the warrant requirement a necessity. *New York v. Belton*, 453 U.S. 454, 457, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981). In addition, the U.S. Supreme Court and our Nebraska Supreme Court have recognized that it is proper at the station house for the police to remove and list or inventory property found on the arrested person or in the possession of an arrested person about to be jailed. *Illinois v. Lafayette*, 462 U.S. 640, 103 S. Ct. 2605, 77 L. Ed. 2d 65 (1983); *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

■ The Nebraska Supreme Court in *State v. Dixon*, 237 Neb. 630, 636, 467 N.W.2d 397, 403 (1991), held that a range of governmental interests supports an inventory process, which includes

> (1) protecting property of an arrestee in custody, (2) protecting police from groundless claims that an arrestee's property has not been properly safeguarded, (3) protecting or maintaining security of a detention facility by preventing introduction of weapons or contraband into the facility, and (4) ascertaining or verifying an arrestee's identity.

While the propriety of an inventory search is judged by a standard of reasonableness, an inventory search must also be conducted pursuant to standardized policies or established routine. *State v. Filkin*, 242 Neb. 276, 494 N.W.2d 544 (1993). The reason why the courts have required that standardized criteria or established routine must

> regulate the opening of containers found during inventory searches is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime[.]"

*Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990).

In *U.S. v. Johnson*, 820 F.2d 1065 (9th Cir. 1987), the defendant, convicted of bank robbery, had had currency in his jacket when he was arrested for driving while under the influence of alcohol. At the time of his detention, the currency was inventoried and placed in an envelope. Later, at the request of an FBI agent, the envelope was opened, and serial numbers on the currency were compared with those on currency stolen during a bank robbery. The *Johnson* court acknowledged that there are governmental interests in safety, protection of the owner's property, and protection for the police from claims of lost property which underlie the rationale for an inventory search. However, "[n]one of these motivations compelled the officer to open the package. Rather, he examined the currency in order to determine whether it was the currency stolen in a bank robbery. Searching for incriminating evidence of a crime does not fall within the purview of an inventory search." *Id.* at 1072.

Nonetheless, the *Johnson* court upheld the trial court's decision to deny the defendant's motion to suppress because the police had subjected the money to a cursory inventory search the first time it was seized, and therefore, the defendant had a significantly reduced expectation of privacy. "Even though the officer did not in fact at first record the serial numbers of the bills, he could have done so legitimately without a warrant." *Id.* Therefore, the court held, the evidence regarding the serial numbers was admissible.

In the same manner, in *State v. William*, 248 Kan. 389, 807 P.2d 1292 (1991), the state, in a cross–appeal, alleged the trial court had erred in suppressing a note written by the defendant in which he referred to tying up his victim and threatened to mutilate him unless he consented to engage in sexual relations. The note was among the defendant's personal possessions removed from him at the time the defendant was booked. The personal possessions were placed in an envelope and put in a property locker. At the time the defendant was booked, a corrections officer looked at the papers taken from the defendant and "just flipped through the papers to see if there was any money that needed to be separated and then listed them on the inventory sheet as miscellaneous papers. . . . He did not

individually read any of the sheets of paper." *Id*. at 421, 807 P.2d at 1315. The police opened up the envelope the next day to look for the note, because one officer had observed at the time of booking that the defendant seemed especially concerned about the note, which had been wadded up. The defendant appeared to be trying to hide the note among his other papers. The *William* court held that because the note had once been lawfully seized, through the inventory inspection and listing as miscellaneous paper, it was lawful for the police officers to go back and take a second look at the inventoried personal effects without a search warrant and remove evidence from the property room.

In the case at hand, while there is evidence that it is the policy of the Clark County Detention Center to conduct an inventory search of the luggage for contraband or weapons or explosives and that there would have been no further inventory done prior to placing the luggage in the property room, such policy was not, in fact, followed in this case. The luggage was inventoried as bulk items, was not opened, and was not searched for contraband, weapons, or explosives prior to being placed in the property room. The items inside the luggage were not inventoried prior to the luggage being placed in the property room. Las Vegas police sergeant Goldberg's report seems to make clear that the search she and Detective Neumann conducted on Newman's luggage was done only after she was told the Lincoln police wanted the jacket and shoes for evidence, and that the search was conducted solely for the purpose of looking for that evidence. It cannot be characterized as a routine inventory search. Nor can we say that it would be proper as a "second look" search of a previously inventoried item. No inventory was conducted upon any items in Newman's luggage. Because there was no "first look," there can hardly be a second look.

The State attempts to excuse the search by mischaracterizing the evidence. The State claims that Newman stated at the time he was taken into detention that he had certain items of value in the luggage which would need to be inventoried. The evidence shows no such thing. The State further argues, "Apparently, both as a result of Newman's statement, and as a result of their

own policy to search the baggage for contraband, the luggage confiscated along with Newman was inventoried." Brief for appellee at 27. Again, the evidence shows no such thing.

That said, while the denial of Newman's motion to suppress the jacket and shoes was error, we find it to be harmless. Not all trial errors, even of a constitutional magnitude, entitle an accused to reversal of an adverse trial result; it is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside. *State v. Trackwell*, 244 Neb. 925, 509 N.W.2d 638 (1994). The shoes were not offered into evidence. The jacket seized from Newman's luggage and introduced at trial was merely cumulative evidence. The victim, Denny, and Grady all identified Newman from a photograph in which Newman was not wearing a leather jacket. Moreover, all of these witnesses identified Newman at trial when he was not wearing the jacket. The identification of Newman was not based on his clothing, but on his physical characteristics. Thus, Newman's first assignment of error is without merit.

*Motion in Limine to Bar Denny's and Grady's Testimony.*

Newman argues that Denny's and Grady's testimony regarding a prior act and a subsequent act should have been excluded on the basis that it was offered for an improper purpose, and not for one of the purposes listed in § 27–404(2). Moreover, even if the evidence was admissible under § 27–404(2), Newman argues, it was more prejudicial than probative and therefore should have been excluded under Neb. Rev. Stat. § 27–403 (Reissue 1989).

*Evidence of Other Acts.*

Under § 27–404(2):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The Nebraska Supreme Court has held that the statute's recited list of acceptable uses is illustrative and not intended to

be exclusive. *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994). Evidence, however, which is otherwise admissible under § 27–404(2) may be excluded under § 27–403 if its probative value is outweighed by its prejudicial effect.

▆▆▆ A review of the admission of other acts evidence under § 27–404(2) requires an appellate court to consider

> (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted.

*State v. Carter*, 246 Neb. at 962, 524 N.W.2d at 771. Moreover, in all proceedings in which the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in the admissibility of evidence. *State v. Carter, supra*. The court in *Carter* held that because the exercise of judicial discretion is implicit in a decision regarding whether the evidence is relevant, "it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion." *Id.* at 963, 524 N.W.2d at 772.

▆ In crimes involving sexual assault, evidence of other similar sexual conduct has independent relevance, and such evidence may be admissible whether that conduct involved the complaining witness or third parties. *State v. Carter, supra*. We find the case of *State v. Baker*, 218 Neb. 207, 352 N.W.2d 894 (1984), to be especially instructive, as it addressed similar other acts testimony. In *Baker*, the victim, a student of a beauty school in downtown Omaha, was waiting for her bus in the early morning at the corner of 45th and Wirt Streets on January 20, 1983. Shortly before the bus was due, the defendant stopped his car and asked the victim if she needed a ride. The victim accepted. The victim was sexually assaulted by the defendant while in the car.

The other acts testimony in *Baker* came from three minors. The first, a 14–year–old girl, was walking to school near 52d and Bedford Streets in the early morning of December 13, 1982, when the defendant drove up and asked her if she wanted to come over to his house for about 20 minutes. The girl refused. The second witness, also a 14–year–old girl, stated that as she was walking home from school near 48th and Maple Streets at about 3 p.m. on January 19, 1983, the defendant drove by and said to her, " 'Hey, Baby, get in my car.' " *Id.* at 210, 352 N.W.2d at 896. The girl kept on walking. The third witness, a 16–year–old girl, was walking home at 50th Avenue and Maple Street at 3:30 p.m. on January 10, 1983, when the defendant approached her in a car, stopped, and offered her a ride home. The girl refused, and the defendant said that he was lonely and would like to spend some time with her. She again declined.

The *Baker* court held that although the trial court instructed the jury that the witnesses' testimony was to be received only for the purpose of determining the motive and intent, the evidence was also clearly admissible to establish preparation, plan, and identity as well as motive and intent. The court found that the evidence was more probative than prejudicial and therefore upheld the defendant's conviction.

In the case at hand, the trial court instructed the jury that Denny's and Grady's testimony was to be received for the limited purpose of placing Newman in the area described on the date and time described, and for no other purpose. We find that not only could the evidence be admitted for that limited purpose, but it could also be introduced for purposes of establishing identity and planning. Newman's only defense was that the victim identified the wrong man as her assailant. Placing Newman within blocks of the crime, within hours of the crime, seemingly stalking one woman to her apartment building and approaching another woman near another apartment building, is relevant to the sexual assault of the victim, and therefore there was no abuse of discretion by the trial court in admitting the evidence.

*Prejudicial Effect.*

Newman argues that even if the testimony of Denny and Grady was relevant, its probative value was outweighed by the prejudicial effect. Balancing the probative value of the evidence against the danger of unfair prejudice is within the discretion of the trial court. *State v. Carter,* 246 Neb. 953, 524 N.W.2d 763 (1994). Although evidence may be prejudicial, that alone is not enough to require its exclusion, because most evidence, if not all evidence, that the State offers to prove a defendant's guilt is calculated to be prejudicial to the defendant. *Id.* Section 27–403 allows for the exclusion of evidence "which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial." *State v. Carter,* 246 Neb. at 965, 524 N.W.2d at 773. The question of whether the evidence was unfairly prejudicial, when the other elements for admissibility have been met, depends upon whether the court properly instructed the jury as to its limited use. *Id.* We find that the court gave a limiting instruction which prohibited the evidence from being used for any improper purpose and therefore find no abuse of discretion by the trial court in admitting the testimony of Denny and Grady.

*Voice Exemplar.*

Newman alleges the district court erred when it held that if he was allowed to introduce a voice exemplar, by means of making a statement to the jury, to show a lack of accent, Newman would waive his Fifth Amendment privilege against self–incrimination and subject himself to cross–examination. Newman argues that because the State can compel him to provide a voice exemplar or give an in–court voice demonstration without violating his privilege against self–incrimination, he should be allowed to give an in–court voice demonstration without subjecting himself to cross–examination. Newman argues that due process requires reciprocity.

The victim testified that Newman had a slight Hispanic accent. The deputy sheriff who transported Newman back from Las Vegas stated that he spoke with an accent. Denny testified that she was certain he did not speak with an accent, and Reverend Firnhaber testified that Newman did not speak with

an accent. The victim did not identify Newman as her attacker based on his accent in either the photographic lineup or in court. Nonetheless, Newman wanted to be able to speak in court to demonstrate that he did not have a Hispanic accent. The State objected to Newman's offer, and the court sustained the objection.

The U.S. Supreme Court has held that compelling a suspect to give a voice exemplar in a lineup was not compulsion to utter statements which were testimonial, but, rather, "he was required to use his voice as an identifying physical characteristic." *United States v. Wade*, 388 U.S. 218, 222–23, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967). The Court held that giving a voice exemplar was no different than submitting to fingerprinting, photography, measurements, or requests to stand in court, to walk, or to make a particular gesture. None of these demonstrations, the Court noted, give rise to a Fifth Amendment privilege against self–incrimination. "[T]he distinction to be drawn under the Fifth Amendment privilege against self–incrimination is one between an accused's 'communications' in whatever form, vocal or physical, and 'compulsion which makes a suspect or accused the source of "real or physical evidence[.]" ' " 388 U.S. at 223. (Quoting *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966)).

Other courts have held that due process reciprocity would allow an otherwise admissible voice exemplar to be introduced by the defendant without subjecting the defendant to cross–examination. See, *United States v. Esdaille*, 769 F.2d 104 (2d Cir. 1985), *cert. denied* 474 U.S. 923, 106 S. Ct. 258, 88 L. Ed. 2d 264; *People v Scarola*, 71 N.Y.2d 769, 525 N.E.2d 728, 530 N.Y.S.2d 83 (1988). However, while a voice exemplar offered by the defendant is potentially admissible, the defendant still must show that such evidence is reliable.

In *United States v. Esdaille, supra*, the court held that while the defendant's request to give a voice exemplar to show he had a heavy accent would not result in a waiver of his privilege against self–incrimination, the trial court correctly denied the defendant's request to speak, because the voice exemplar would have little probative value, as it was inherently suspect. Its

probative value, the court found, was outweighed by the prejudice to the State because of the ease with which a person can alter his or her accent and the difficulty of challenging the reliability of the proffered accent. The *Esdaille* court noted that in other cases in which the defendant has demonstrated some physical characteristic, there has always been a showing that the evidence was reliable. The court gave an example of a case in which the defendant should have been allowed, without taking the stand, to exhibit a large scar to the jury which the witness had not mentioned when describing the defendant to the police. See *People v Shields*, 81 A.D.2d 870, 438 N.Y.S.2d 885 (1981). Prior to demonstrating the scar on the stand, the defendant in *Shields* proffered hospital records showing that the injury which resulted in the scar preceded the crime, and therefore there was no possibility that the scar was not authentic or reliable evidence. The *Esdaille* court held, however, that "[u]nlike a visible scar or a permanent tattoo . . . a regional accent is a manner of speaking that need be neither permanent nor genuine. One need only have heard an impersonator perform to know that accents can be feigned or deepened." 769 F.2d at 107. The court noted that the witness in *Esdaille* did not identify the defendant on the basis of his accent, nor did police arrest the defendant on the basis of his accent.

In *People v. Scarola, supra*, the court found that there was no abuse of discretion by the trial court when it disallowed a voice exemplar offered by a defendant to show he had a speech impediment. The court held that while the voice exemplar may have been broadly relevant, as the defense was based on mistaken identity, its probative value was outweighed by its potential for unfair prejudice. The court found that the victim did not rely on the defendant's voice to identify him, and "[m]oreover, the foundation for the admission of the evidence . . . did not rule out the possibility that [the defendant] could feign the existence of a speech defect." *Id.*, 71 N.Y.2d at 778, 525 N.E.2d at 733, 530 N.Y.S.2d at 87.

We conclude that a criminal defendant has a constitutional right to give a voice exemplar without being subject to cross-examination, provided the voice exemplar is relevant to the issues of the case and satisfactory evidence is

produced or offered to establish that the exemplar will be genuine. We also conclude that the issues of relevancy of the voice exemplar and of its genuineness are questions for the trial court, and its decision on such issues will not be disturbed in the absence of an abuse of discretion. In this case, the evidence does not establish that Newman clearly and consistently spoke with an accent, and the manner in which Newman offered the voice exemplar included no guarantees that it would be genuine. Therefore, we find no abuse of discretion by the trial court in excluding the voice exemplar.

*Photographic Lineup.*

Newman complains that the photographic lineup shown to the victim was unconstitutionally suggestive and that the police made statements to the victim which led her to pick Newman's photograph and to maintain that Newman was her assailant. Specifically, Newman argues that the other pictures in the photo lineup were older, which suggested that Newman had recent contact with the law, and that the other photographs were of taller men, while the photo of Newman made him look shorter, which Newman's attorney argues was significant because the victim described her assailant as between 5 feet 6 inches and 5 feet 8 inches tall. Our examination of the photographs leaves us at a loss to see what Newman allegedly sees as suggestive in the photographs or in the manner in which they were presented. We are unable to tell the age of the photographs and are unable to determine the relative height of anyone depicted in the photographs.

Newman also argues that remarks the police made to the victim when she was shown the photographs were unduly suggestive. In regard to photo arrays, the Nebraska Supreme Court has held that whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. *State v. Gibbs*, 238 Neb. 268, 470 N.W.2d 558 (1991).

The Nebraska Supreme Court has held that when considering the totality of the circumstances surrounding an out-of-court identification, the trial court should consider

> " 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.' "

*State v. Houser*, 241 Neb. 525, 538, 490 N.W.2d 168, 178 (1992) (quoting *State v. Richard*, 228 Neb. 872, 424 N.W.2d 859 (1988)).

At the hearing on the motions to suppress, the victim was asked:

Q Do you recall when asking a question that Officer — I had asked you a question that Officer Scott had asked you and you had said — You recalled stating that Officer Scott said, "Take your time. You don't have to pick one out real fast."

A Yes.

Q Is that what he said to you?

A Yes.

Newman argues that telling the victim that she did not " 'have to pick one out real fast' " meant that "she did in fact have to pick one of the photos as her assailant." Brief for appellant at 45. We doubt if the victim or any reasonable person would think that on the lineup, that being told she did not have to pick one out " 'real fast' " meant that she had to pick a suspect, any suspect. We can find nothing in the record to suggest that the trial court was clearly erroneous when it denied Newman's motion to suppress the identification of Newman from the photographic lineup. Newman's assignment of error is without merit.

*Sufficiency of Evidence.*

Newman alleges that the evidence was insufficient to convict him of sexually assaulting the victim. The evidence is clearly sufficient to sustain the conviction. We find no prejudicial error and affirm the trial court's judgment.

AFFIRMED.