922 P.2d 1007

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Clifford Kailipuuwai APO, Defendant–Appellant.**

**No. 16501.**

Intermediate Court of Appeals of Hawai'i.

July 9, 1996.

396

Thomas D. Yano, on the brief, Lihue, for defendant-appellant.

Blaine J. Kobayashi, Deputy Prosecuting Attorney, County of Kauai, on the brief, Lihue, for plaintiff-appellee.

Before WATANABE, ACOBA and KIRIMITSU, JJ.

ACOBA, Judge.

Defendant-Appellant Clifford Kailipuuwai Apo (Defendant) was indicted on June 18, 1990 for Terroristic Threatening in the First Degree in violation of Hawai'i Revised Statutes (HRS) §§ 707–715 (1993) and 707–716(1)(d) (1993) (Count I), Resisting Arrest in violation of HRS § 710–1026(1)(a) (1993) (Count II), and Prohibited Ownership or Possession of a Firearm in violation of HRS § 134–7 (Supp.1992) (Count III).[1]

On June 10, 1991, Defendant filed a motion to suppress a .22 caliber rifle that the police seized on April 6, 1990, maintaining that the rifle was unlawfully obtained without a warrant in violation of Defendant's constitutional right against unreasonable search and seizure. On August 5, 1991, the court ruled in its Findings of Fact, Conclusions of Law and Order that the rifle, along with two bullet casings, were in plain view in Defendant's living room, and thus, were properly recovered.[2]

Defendant's jury trial commenced on August 19, 1991. At trial, the court admitted the items that Defendant had sought to suppress into evidence. On August 20, 1991, the jury found Defendant guilty on the felon in possession of a firearm offense, Count III, and acquitted him on Counts I and II. Defendant was sentenced to a five-year term of imprisonment with credit given for time already served. Judgment was entered accordingly on September 4, 1992.

On appeal, Defendant contends that the court erred in denying his motion to suppress evidence. Alternatively, Defendant claims that even if the seizure of evidence was valid, his conviction should be reversed due to the ineffective assistance of his counsel. We affirm.

I.

The video transcript of the suppression hearing is not part of the record on appeal. The clerk's minutes of the July 3, 1991 hearing on Defendant's motion to suppress, however, indicate that the parties stipulated to the facts contained in the police report designated as Q–5487. We set forth the facts adduced from the subject police report and the evidence received at trial pertinent to the suppression motion. *State v. Kong,* 77 Hawai'i 264, 266, 883 P.2d 686, 688 (App.1994) (providing that the appellate court may consider evidence at trial when reviewing an order denying a motion to suppress evidence).

On the evening of April 6, 1990, Defendant, Mildred Funes (Funes),[3] and others were sitting on Funes's front porch drinking

---

1. Hawai'i Revised Statutes (HRS) § 134–7(b) (Supp.1992) states:

 (b) *No person who* is under indictment for, or has waived indictment for, or *has been convicted in this State or elsewhere of* having committed a felony, or *any crime of violence,* or an illegal sale of any drug *shall* own, *possess, or control any firearm or ammunition therefor.*

 (Emphases added.) HRS § 134–1 (Supp.1992) defines "firearm" as follows:

 "Firearm" means any weapon, for which the operating force is an explosive, including but not limited to pistols, revolvers, rifles, shot-guns, automatic firearms, noxious gas projectors, mortars, bombs, and cannon.

2. Although Defendant's motion to suppress evidence did not mention the two bullet casings, the trial court apparently determined that they were admissible, and Defendant challenges that determination on appeal.

3. At the time of the incident, Mildred Funes and her boyfriend Sirmon Wright had not yet married. By the time of trial, Funes had married Wright and adopted his name, and she testified that her name was "Mildred Wright." For clarity, we will refer to Mildred as "Funes" and Sirmon as "Wright."

beer and eating pūpūs.[4] At approximately 10:30 p.m., a loud argument ensued between Defendant and Funes, allegedly due to a comment Funes made about the Hawaiian people. Defendant became very upset and returned to his home which was located approximately ten feet away. Subsequently, Funes heard three to four gunshots coming from Defendant's home. Defendant then exited his home, and Funes claimed that Defendant aimed the rifle in her direction, made a comment, and fired a shot in the air. At that point, Sirmon Wright (Wright), Funes's boyfriend, exited Funes's home and saw Defendant with the rifle. Wright told Defendant to "cool it" and to go home. Defendant then returned to his house. Following these events, Funes called the police.

Once in his home, Defendant went into the living room with his rifle where his girlfriend, Sabra McCracken (McCracken) was situated. McCracken had arrived earlier in the evening and had been watching television in the living room after leaving the gathering at Funes's home. At that point, McCracken asked him if the rifle was empty. In response, Defendant fired another shot out the window and proceeded to clear the chamber. McCracken was then able to calm Defendant down. He placed the rifle against the wall near the front door and sat down to talk with McCracken.

Upon arrival at the scene, Sergeant Harris Moriguchi (Sergeant Moriguchi) interviewed Funes while Officer Howell Kaleohano (Officer Kaleohano) spoke to Defendant outside of Defendant's home. Shortly thereafter, Sergeant Moriguchi informed Officer Kaleohano that they would have to arrest Defendant based on information provided by Funes and a .22 caliber bullet casing found on the cement walkway between Funes's and Defendant's residences by another officer. Hearing this exchange, Defendant walked back

into his house stating that he was going to kill himself.

Defendant then allowed Sergeant Moriguchi to enter his kitchen to speak with him. Defendant was again told of his impending arrest. At that point, Defendant started to walk away from Sergeant Moriguchi, who then grabbed Defendant. A struggle between them resulted in the immediate entry into the kitchen area of the five officers who had been waiting outside to assist Sergeant Moriguchi in Defendant's arrest.

Following Defendant's arrest, Officer Kaleohano remained in the residence to interview McCracken, who had been in the home at the time of the incident. Officer Kaleohano followed McCracken from the kitchen area into the living room to conduct the interview. According to Officer Kaleohano's police report, he observed a .22 caliber rifle leaning against a couch. At trial, McCracken testified that the rifle was leaning "against the wall right near the front door in the living room." Officer Kaleohano then asked if the rifle was the one which Defendant had used. She replied "yes." McCracken related that Officer Kaleohano then asked her if she would "mind picking it up and handing it to [him]." McCracken complied with the request. Officer Kaleohano then observed and seized two .22 magnum bullet casings lying on the floor of the living room. After returning to the kitchen area from the living room, Officer Kaleohano also seized a .22 magnum bullet casing from the kitchen floor.[5]

## II.

With respect to the motion to suppress, Defendant objects to the following trial court's Conclusions of Law: Conclusion of Law No. 1 stating "Officer Kaleohano was lawfully within the Defendant's residence," Conclusion of Law No. 3 stating "Officer Kaleohano was lawfully within the living

---

4. "Pūpū" is a Hawaiian word for "[r]elish, appetizer[.]" M. Pukui & S. Elbert, *Hawaiian Dictionary* 357 (rev. ed. 1986).

5. At trial, the court apparently misidentified some of the evidence. The court received into evidence one bullet casing found in the living room as State's exhibit 2, and two bullet casings

found in the kitchen as State's exhibit 3. According to the court's Findings of Fact, Conclusions of Law and Order on Defendant's Motion to Suppress Evidence, the police report, and witness testimony, however, two bullet casings were recovered from the living room and one from the kitchen.

room area of Defendant's residence," and Conclusion of Law No. 5 stating "These items [ (the rifle and two bullet casings) ] were properly recovered from the scene[.]" Defendant claims these conclusions were erroneous because Defendant's constitutionally guaranteed right of the expectation of privacy in his home was violated. *See State v. Texeira*, 62 Haw. 44, 48, 609 P.2d 131, 134–35 (1980) (citations omitted).

■ "A court's conclusions of law are reviewed under the right/wrong standard. Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Tangalin*, 79 Hawai'i 92, 95, 898 P.2d 604, 607 (App.1995) (citations and internal quotation marks omitted).

### A.

■ With respect to Conclusion of Law No. 1, Defendant contends that Officer Kaleohano was not lawfully within Defendant's residence. "[L]aw enforcement officers may not enter the home of a suspect to effect his arrest, without his consent or without prior judicial authorization, in the absence of exigent circumstances." *State v. Lloyd*, 61 Haw. 505, 510–11, 606 P.2d 913, 917 (1980). Exigent circumstances exist when immediate police response is reasonably required "to prevent imminent danger to life or serious damage to property, or to forestall the likely escape of a suspect or the threatened removal or destruction of evidence." *Id.* at 512, 606 P.2d at 918 (footnote omitted). The burden is on the State to show "specific and articulable facts from which it may be determined that the action the police took was necessitated by the exigencies of the situation." *State v. Barnett*, 68 Haw. 32, 36, 703 P.2d 680, 683 (1985) (citations, quotation marks and brackets omitted).

■ In this case, Defendant consented to Sergeant Moriguchi's presence in his kitchen. The five officers, including Officer Kaleohano, justifiably entered the home to prevent imminent danger to the life of Defendant and/or to Sergeant Moriguchi based on Defendant's suicide threat and because the offi-

cers had not yet recovered Defendant's weapon. Furthermore, after it became apparent that Sergeant Moriguchi was unable to secure Defendant and Defendant was resisting arrest, the officers' presence was necessary to forestall Defendant's escape. Thus, the officers' entry into Defendant's kitchen was warranted by exigent circumstances.

### B.

### 1.

With respect to Conclusion of Law No. 3, Defendant argues that no exigent circumstances existed to allow Officer Kaleohano to venture into the living room area of Defendant's residence. Defendant contends that once a suspect is placed into custody and removed from the premises, as Defendant was here, there were no residual exigent circumstances which could justify Officer Kaleohano's entry into Defendant's living room.

■ We agree that no exigent circumstances existed here to justify Officer Kaleohano's entry into Defendant's living room. Defendant's arrest removed any threat of "imminent danger to life or serious damage to property" and extinguished any possibility of Defendant's escape. *Lloyd*, 61 Haw. at 512, 606 P.2d at 918 (footnote omitted). Defendant's arrest also diminished the risk of "removal or destruction of evidence" which consisted of the rifle and the bullet casings. *Id.* "[I]t is obvious that once an arrestee has been removed from that area, he is no longer capable of using weapons or destroying evidence located there. This being so, legitimate necessity no longer impedes the police from securing a warrant to search the site." *State v. Kaluna*, 55 Haw. 361, 364, 520 P.2d 51, 55 (1974). The facts do not indicate that there was any risk that the rifle might be removed or destroyed after Defendant was arrested. In the absence of any exigent circumstances, a warrant was required for the police to enter any other room outside of the kitchen. The State does not indicate why the officers were unable to obtain a search warrant.

### 2.

Absent exigent circumstances or a search warrant, Defendant contends Officer Kaleohano had no authority to seize the rifle and bullet casings from Defendant's living room. We agree.

 "There is no question that a person generally has an actual, subjective expectation of privacy in his or her home... [which] society recognizes as objectively reasonable." *State v. Lopez,* 78 Hawai'i 433, 442, 896 P.2d 889, 898 (1995). A " 'search' in the constitutional sense" occurs when there is a "governmental invasion of a person's legitimate expectations of privacy[.]" *State v. Wallace,* 80 Hawai'i 382, 394, 910 P.2d 695, 707 (1996) (citation omitted). Officer Kaleohano's entry into the living room did constitute a " 'search' in the constitutional sense" because the officer invaded Defendant's legitimate expectation of privacy in his home. *Id.*

McCracken had no authority to consent to Officer Kaleohano's entry into Defendant's living room or to permit him access into the room. While the United States Supreme Court has adopted the doctrine of "apparent authority," [6] Hawai'i, in contrast, has continuously recognized that consent to a warrantless search requires a showing of "actual authority." *See Lopez,* 78 Hawai'i at 445, 896 P.2d at 901 (citing *State v. Mahone,* 67 Haw. 644, 647, 701 P.2d 171, 173–74 (1985) (holding that "the consent of a third party cannot validate a warrantless search unless the third party possessed authority to consent"); *State v. Matias,* 51 Haw. 62, 67, 451 P.2d 257, 260 (1969) (holding that an individual's constitutional right to privacy "cannot be waived by

another" unless the individual has "authorized another to do so")).

 "In order for a consent to search to be valid under article I, section 7 of the Hawai'i Constitution,[7] the individual consenting must actually possess the authority to do so." *Lopez,* 78 Hawai'i at 447, 896 P.2d at 903 (footnote added). "[A] third person can effectively consent to a search of a defendant's premises or effects if that third person has 'access to the area searched, and either common authority over it, a substantial interest in it, or permission to exercise that access....' " *Mahone,* 67 Haw. at 647, 701 P.2d at 174 (quoting *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974) (per curiam)).

 In the case at bar, the facts in the record do not support a finding that McCracken possessed "actual authority" to permit Officer Kaleohano's entry into Defendant's living room area. At trial, McCracken testified that she had her own separate residence at the time of the incident in question. While it is clear that McCracken had access to the living room area, there is no evidence she had Defendant's permission to allow Officer Kaleohano into the living room.

Consequently, we conclude that Officer Kaleohano was not lawfully in the living room and that the trial court's Conclusion of Law No. 3, that "Officer Kaleohano was lawfully within the living room area of Defendant's residence" was incorrect.

### C.

 Because Officer Kaleohano was not lawfully in the living room, the plain view

---

6. The United States Supreme Court adopted the doctrine of "apparent authority" in *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). The court created the following test to determine the constitutional validity of a warrantless search based on consent:

> [D]etermination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*State v. Lopez,* 78 Hawai'i 433, 444, 896 P.2d 889, 900 (1995) (some brackets added) (internal quotation marks omitted) (quoting *Rodriguez,* 497 U.S. at 188–89, 110 S.Ct. at 2801).

7. Article I, section 7 of the Hawai'i Constitution states:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

doctrine was not applicable, and thus, Conclusion of Law No. 5 was wrong. "In order for the plain view doctrine to apply, a police officer must be engaged in a lawful intrusion or must otherwise legitimately occupy the position affording him a 'plain view.'" *State v. Meyer*, 78 Hawai'i 308, 316, 893 P.2d 159, 167 (1995) (emphasis omitted) (citing *Texas v. Brown*, 460 U.S. 730, 737 n. 3, 103 S.Ct. 1535, 1540 n. 3, 75 L.Ed.2d 502 (1983)). In a "plain view," as opposed to an "open view" situation, the view occurs after an officer has already intruded into an area where there is a reasonable expectation of privacy with justification, and the officer inadvertently sees the object in plain view. *Meyer*, 78 Hawai'i at 312–13, 893 P.2d at 163–64 (citing *State v. Kaaheena*, 59 Haw. 23, 28, 575 P.2d 462, 466 (1978)). In an "open view" circumstance, the officer observes an object which is knowingly exposed to the public from a "non-intrusive vantage point." *Meyer*, 78 Hawai'i at 313, 893 P.2d at 164 (quoting *Kaaheena, supra*).

█ If "the intrusion is justified, there is no requirement of exigency to seize evidence in plain view." *Meyer*, 78 Hawai'i at 313, 893 P.2d at 164. If the police are in a lawful position and see an incriminating object in plain view, they may seize it without a warrant. *Id.* (citing *Minnesota v. Dickerson*, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)) (citations omitted).[8] A plain view observation does not constitute a search because there is no invasion of an individual's privacy. *Meyer*, 78 Hawai'i at 312, 893 P.2d at 163.

In this case, the prior justification for Officer Kaleohano's intrusion into Defendant's home was exigent circumstances. However, there was no justification for the officer to exceed the scope of what was absolutely necessary to affect Defendant's arrest in the kitchen. *Cf. State v. Paahana*, 66 Haw. 499, 505, 666 P.2d 592, 597 (1983) ("If law enforcement officials exceed the scope of what is considered absolutely necessary to accomplish the purposes for which such searches

are permitted, the warrantless search can no longer be justified as a permissible search incident to a valid arrest.") (citations omitted).

█ Defendant retained a reasonable expectation of privacy in his living room. Once in the living room, Officer Kaleohano discovered the rifle and two bullet casings. Because the exigent circumstances ceased to exist upon Defendant's arrest and Officer Kaleohano's entry into the living room was without the consent of Defendant or a third person who had actual authority to give such consent, his entry into the living room was not a "lawful intrusion" into an area protected by Defendant's right to privacy. *Meyer*, 78 Hawai'i at 316, 893 P.2d at 167. Hence, the plain view doctrine did not apply. Of course, the discovery of the incriminating evidence did not remove the taint from the unlawful intrusion or convert the illegal "search" of the living room into a legal one. *See State v. Phillips*, 67 Haw. 535, 541, 696 P.2d 346, 351 (1985) ("A search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success.") (citation, quotation marks and brackets omitted).

Accordingly, we reverse the trial court's denial of the motion to suppress and hold that the rifle and two bullet casings found in the living room were obtained through an illegal seizure.

## III.

Defendant additionally argues that without the rifle and the two bullet casings, the remaining evidence at trial would be insufficient to convict him.

█ It is well settled "that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction[.]" *State v. Batson*, 73 Haw. 236, 248, 831 P.2d 924, 931, *reconsideration de-*

8. Certainly, there was no evidence that Defendant authorized McCracken to consent to Officer Kaleohano's seizure of the rifle or the bullet casings.

Insofar as Officer Kaleohano's statements to McCracken may be construed as requesting permission to seize the rifle, the statements would be legally superfluous in the context of a purported plain view seizure.

*nied,* 73 Haw. 625, 834 P.2d 1315 (1992). On appeal, the test is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the fact finder. *State v. Gabrillo,* 10 Haw.App. 448, 458–59, 877 P.2d 891, 896 (1994) (citation omitted). Substantial evidence is evidence "of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion." *Batson,* 73 Haw. at 248–49, 831 P.2d at 931 (citing *State v. Lima,* 64 Haw. 470, 475, 643 P.2d 536, 539 (1982)). Applying these principles, we hold that even without the rifle and the two bullet casings, there was substantial evidence admitted at trial supporting the jury's guilty verdict.

Possession of any firearm and ammunition therefor by a person who has been convicted of any crime of violence constitutes a violation of HRS § 134–7. At trial, the parties stipulated that Defendant had been previously convicted of Assault in the Third Degree, a crime of violence. McCracken testified that she had seen Defendant in possession of a rifle, and that he fired a shot from that rifle. Funes testified that she had seen Defendant in possession of a rifle and that he had fired a shot from it.[9] Following the initial three to four shots Funes heard coming from Defendant's home, Wright also saw Defendant in possession of a rifle. Moreover, one of the officers seized a .22 magnum casing just outside of Defendant's kitchen on the walkway.[10] This evidence was sufficient to independently "enable a [person] of reasonable caution to support [the] conclusion" that Defendant was a person previously convicted of a crime of violence who, on April 6, 1990, possessed a firearm and ammunition therefor. *See Batson, supra.*

## IV.

We must still determine whether the improper admission of the rifle and bullet casings was harmless error.

**9.** The fact that the rifle Defendant fired was a firearm "for which the operating force [was] an explosive" is evident from the witnesses' testimony. HRS § 134–1.

**10.** The seizure of this bullet casing is not addressed by any party or the circuit court.

"The admission of illegally obtained evidence in a criminal trial following the erroneous denial of a motion to suppress is subject to the harmless error rule." *People v. Hobson,* 169 Ill.App.3d 485, 121 Ill.Dec. 588, 593, 525 N.E.2d 895, 900 (1988) (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)) (citation omitted).

Courts have found the erroneous denial of motions to suppress "harmless" where the illegally obtained evidence was not critical to the determination of the defendant's guilt or where there was sufficient other evidence of the defendant's guilt. *See, e.g., State v. Newman,* 4 Neb.App. 265, 541 N.W.2d 662, 672, *aff'd,* 250 Neb. 226, 548 N.W.2d 739 (1996) (affirming denial of motion to suppress the defendant's jacket and shoes as harmless error in a first degree sexual assault conviction, where the shoes were not offered into evidence, the jacket was cumulative evidence, and witnesses identified the defendant at trial and from a photograph where he was not wearing the jacket); *Penzloza v. State,* 638 So.2d 193, 194 (Fla.Dist.Ct.App.1994) (affirming denial of motion to suppress audiotapes found in the defendant's trunk in burglary and grand theft convictions, because "even if there were error, it was utterly harmless in light of the lack of specificity in the officers' testimony, the tangential nature of the evidence and the other evidence of guilt"); *State v. Turner,* 99 Or.App. 176, 781 P.2d 404, 405 (1989) (affirming denial of motion to suppress evidence obtained as result of allegedly invalid arrest as harmless error where the court's denial of the motion "made no difference in the outcome of the trial"); *People v. Hobson,* 169 Ill.App.3d 485, 121 Ill.Dec. 588, 593, 525 N.E.2d 895, 900 (1988) (affirming denial of motion to suppress evidence of various objects from the defendant's garage in a conviction for possession of a stolen motor vehicle, where there was other evidence [11] "sufficient to prove defendant's guilt

**11.** The other sufficient evidence for the defendant's conviction in *People v. Hobson,* 169 Ill. App.3d 485, 121 Ill.Dec. 588, 593, 525 N.E.2d 895, 900 (1988) included the detective's testimony of what he observed in the defendant's garage, the stipulated testimony as to the facts preceding the defendant's arrest, and the stipu-

of the offense charged beyond a reasonable doubt").

 Substantial evidence of Defendant's possession of a firearm and ammunition therefor was, as set forth *supra*, amply and independently established by the testimonies of McCracken, Funes, and Wright. Under the circumstances, we hold that the admission of the rifle and bullet casings into evidence was harmless beyond a reasonable doubt. *See State v. Holbron*, 80 Hawai'i 27, 904 P.2d 912, *reconsideration denied*, 80 Hawai'i 187, 907 P.2d 773 (1995).

### V.

 Finally, Defendant argues that his conviction should be reversed because he was denied his constitutional right to the effective assistance of counsel. To establish ineffective assistance of counsel, a defendant must show "1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." *State v. Edwards*, 81 Hawai'i 293, 300, 916 P.2d 703, 710 (1996) (internal quotation marks omitted) (quoting *State v. Silva*, 75 Haw. 419, 440, 864 P.2d 583, 593 (1993)).

Defendant argues that because Officer Kaleohano was unavailable to testify at trial, defense counsel should have requested a continuance of trial to allow for the officer's testimony. The notation on the officer's returned trial subpoena stated "Subject on vacation, out of town." Defendant maintains that the officer's testimony was critical because only the officer and McCracken could testify to the circumstances surrounding the events occurring in the kitchen and the living room.

 We find no merit in this claim. As previously pointed out, the videotape of the suppression hearing was not made a part of the record on appeal. However, the record shows that a subpoena was served on Officer Kaleohano for the suppression hearing and that the officer testified at the hearing.[12] Thus, Defendant did obtain Officer Kaleohano's testimony concerning the events of April 6, 1990.

Second, Defendant fails to demonstrate how the lack of Officer Kaleohano's trial testimony resulted in "either the withdrawal or substantial impairment of a potentially meritorious defense." *Edwards*, 81 Hawai'i at 300, 916 P.2d at 710. Defendant does not explain what additional testimony Officer Kaleohano would have given at trial which would result in Defendant's acquittal. Officer Kaleohano had testified at the suppression hearing, his police report was in evidence, and McCracken had testified to Officer Kaleohano's statements and conduct at the times material and relevant to the motion. We have no basis, therefore, to determine how Officer Kaleohano's potential testimony could have supported Defendant.

Considering the evidence at the suppression motion hearing and at trial, the allegation that defense counsel's purported error resulted in prejudice to Defendant was speculative. *See State v. Reed*, 77 Hawai'i 72, 84, 881 P.2d 1218, 1230 (1994) (holding that where the defendant's characterization of the witnesses' potential testimony "amounts to nothing more than mere speculation[,]" insufficient proof exists that defense counsel's failure to subpoena certain witnesses constituted ineffective assistance of counsel).

Finally, based on our holding that the circuit court erred in failing to suppress the rifle and the bullet casings, we conclude that any alleged ineffectiveness of counsel with respect to the motion to suppress is moot.

### VI.

For the foregoing reasons, we reverse the lower court's denial of Defendant's motion to suppress evidence. Because the admission of the subject evidence constituted harmless er-

---

lated testimony of the car owner that he had not given the defendant permission or authority to be in his vehicle.

12. The subpoena is correctly addressed to Officer Howell Kaleohano, but the minutes apparently mistakenly refer to the officer as "Hartwell" Kaleohano.

ror, however, we affirm Defendant's September 4, 1992 judgment of conviction.