Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/19/2022 09:08 AM CDT

State of Nebraska, appellee, v.
Stephen R. Prior, appellant.

___ N.W.2d ___

Filed April 12, 2022.    No. A-20-888.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Property: Appeal and Error.** A trial court's finding that an item of personal property has been abandoned, and thus not subject to a reasonable expectation of privacy, is reviewed for clear error.

3. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court reviews the admission of evidence of other acts under Neb. Rev. Stat. § 27-404(2) (Supp. 2019) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted.

4. **Convictions: Evidence: Appeal and Error.** Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction.

5. **Evidence: Appeal and Error.** The relevant question for an appellate court on review of the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

6. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

7. \_\_\_\_: \_\_\_\_. In reviewing a sentence imposed within the statutory limits, an appellate court considers whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any legal principles in determining the sentence to be imposed.

8. **Sentences.** Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively.

9. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government.

10. **Search and Seizure.** When individuals voluntarily abandon property, they forfeit any expectation of privacy in the property that they might otherwise have had.

11. **Constitutional Law: Search and Seizure.** Because the Fourth Amendment does not protect voluntarily abandoned property, a warrantless search or seizure of abandoned property does not violate the Fourth Amendment.

12. \_\_\_\_: \_\_\_\_. A search for Fourth Amendment purposes occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

13. **Constitutional Law: Property: Search and Seizure.** Once a defendant abandons an item of personal property and makes it available to the police or the public, he or she does not retain a reasonable expectation of privacy in the property for purposes of Fourth Amendment protection.

14. **Constitutional Law: Property: Search and Seizure: Police Officers and Sheriffs: Proof: Intent.** To show abandonment of personal property for purposes of the Fourth Amendment, the State must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable officer to believe the defendant relinquished his or her property interests in the item. This is an objective test based on the information available to the officer, and the defendant's subjective intent to later reclaim the item is irrelevant.

15. **Property: Search and Seizure.** When determining whether property has been abandoned, courts consider the totality of the circumstances, and pay particular attention to the nature and location of any physical relinquishment of the property and any explicit denials of ownership.

16. **Trial: Evidence: Appeal and Error.** An objection must be specifically stated, and on appeal, a defendant may not assert a different ground for his or her objection to the admission of evidence than was offered to the trier of fact.

17. **Identification Procedures: Police Officers and Sheriffs: Motions to Suppress.** Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct.

18. **Trial: Identification Procedures.** When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.

19. **Convictions: Appeal and Error.** Appellate courts will not reverse a criminal conviction in the absence of prejudice to the defendant.

20. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

21. **Evidence: Appeal and Error.** A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion.

22. **Trial: Evidence: Other Acts.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion.

23. **Evidence: Other Acts: Appeal and Error.** An appellate court reviews the admission of evidence of other acts by considering whether the evidence was relevant, whether the evidence had a proper purpose, whether the probative value of the evidence outweighed its potential for unfair prejudice, and whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted.

24. **Trial: Witnesses: Service of Process.** Process to secure attendance of witnesses from another state may not be issued unless the testimony proposed to be elicited from such witnesses is relevant to the issues to be tried.

25. **Trial: Pleadings: Evidence.** It is proper to sustain a motion in limine to prevent reference to or the offer of evidence concerning matters which are entirely extraneous or irrelevant to the issues of the case.

26. **Criminal Law: Directed Verdict.** In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed.

27. **Sentences.** When imposing a sentence, a sentencing judge should customarily consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. However, the sentencing court is not limited to any mathematically applied set of factors.

28. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Sarpy County: GEORGE A. THOMPSON, Judge. Affirmed.

Thomas P. Strigenz, Sarpy County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Stephen R. Prior appeals seven felony convictions and two misdemeanor convictions related to a home invasion robbery and sexual assault and the sentences imposed thereon. Specifically, he contends that the district court erred in finding he did not have an expectation of privacy in an abandoned

bag found outside of an apartment complex, overruling his motion to suppress the victim's in-court voice identification of him, allowing the State to adduce evidence of Prior's physical characteristics, admitting witness testimony of prior bad acts, denying his request to secure attendance of out-of-state witnesses, denying his motion for directed verdict, and imposing excessive sentences. For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. Facts Giving Rise to Prior's Arrest

At 9 p.m. on October 18, 2017, W.R., who lived alone, returned to her home from work. After parking her vehicle in her garage, W.R. retrieved her mail and placed her garbage can and recycling at the curb. After performing these routine activities, W.R. entered her home and closed her garage door. She then cooked dinner, took a shower, and went to sleep. The normality of the evening ended at approximately 11:30 p.m., when a stranger, who wore a black mask extending from his nose to his neck while brandishing a black semiautomatic handgun, woke W.R. by shining a light in her eyes. The perpetrator told W.R. that he "just want[ed her] money" and forced W.R. into the kitchen where her purse was located. When the perpetrator told W.R. to throw the money on the table, W.R. noticed that the perpetrator was wearing black gloves.

The perpetrator then forced the victim to an exercise room near the garage, where he told the victim to face the wall with her hands up. Although the perpetrator left, he returned shortly thereafter, telling the victim that "we're going to go upstairs, and I'm going to be here for a while." The perpetrator forced the victim upstairs to her bedroom and directed W.R. not to look at him. The perpetrator directed W.R. to "[p]ut her face in the pillow," after which he removed W.R.'s clothing and used rope to bind W.R.'s wrists and ankles. Although the perpetrator blindfolded the victim with her pillowcase, it was not tied tightly and W.R. was able to see around it.

After W.R. was blindfolded, the perpetrator removed his mask and gloves and proceeded to kiss, touch, and digitally penetrate W.R. without her consent. The perpetrator also forced W.R. to perform oral sex on him, after which he retrieved a condom and then vaginally penetrated W.R. without her consent. At some point throughout the encounter, the individual pulled out the knife in his front pocket and cut the ropes binding W.R.

Following the assault, the perpetrator forced W.R. to take a shower, telling her that "you're going to wash your mouth out with water at least two times" and that "you're going to stay in there at least five minutes, and then I'm going to be gone." After a few minutes, the perpetrator returned to the bathroom stating, "I'm still here." W.R. complied with the perpetrator's demands, staying in the shower for about 10 minutes until she could no longer hear him, after which she immediately dressed and drove to a friend's home. En route, W.R. called her friend and explained what had happened. During the call, W.R. expressed fear about reporting the assault due to the perpetrator's threats to kill her. However, W.R.'s friend reported the assault, and by the time W.R. arrived at her friend's home, paramedics and the police were present.

W.R. was able to provide law enforcement with specific details regarding the assault and the perpetrator because the blindfold had not been tied tightly and did not completely block W.R.'s vision during the assault. W.R., who at the time was a medical resident, described the perpetrator as a white male who had disheveled "grayish brown" hair; was approximately 50 to 60 years old; smelled of cigarette smoke; did not have pubic hair; was circumcised; had approximately a 1-centimeter horizontal scar on his abdomen, which W.R. believed to be a laparoscopic scar; had a tight and distended abdomen; and had what appeared to be another scar running down his chest and "around the left side of his belly button." W.R. provided the same identifying characteristics to a sketch artist in order to help identify her assailant.

W.R. also informed law enforcement that she had observed a knife in the right front pocket of the perpetrator's black jeans and that the rope used to bind her was white, about 1 centimeter in diameter, and made from an unknown soft material that she knew was not twine. The perpetrator wore a black T-shirt, a black sweatshirt, and a pair of glasses with either no frames around the bottom or very thin frames. W.R. stated that she assumed that the perpetrator obtained the condom from a dark-colored bag, about the size of a backpack, that he had placed near her bed.

W.R. reported that although the perpetrator wore a mask part of the time, she could hear and understand him clearly when he spoke. W.R. reported to law enfocement that the perpetrator asked her, "[I]s this the first you've heard [of] me?" and then said, "You need to be more careful. Your garage door didn't close all the way." She testified he also said that "if [she] ever told anybody that he would come and find [her] and kill [her]." W.R. told law enforcement that she felt terrified throughout the encounter and believed she was going to die.

## 2. Investigation

While W.R. provided information to law enforcement, other officers went to the victim's home which showed no signs of forced entry. Officers noted that the bedding in one of the bedrooms was disheveled and that there was water alongside the shower door. Law enforcement collected evidence from W.R.'s home, including a "bunched up" condom that was found in bedroom linens where the assault occurred. The condom appeared to contain a "moisture," which officers could not identify without testing. Law enforcement also collected three strands of gray hair located on the bedroom floor and a half empty bottle of water. Law enforcement also located eight stains in the bedroom, none of which presumptively tested positive for semen. During this period of time, another officer serving as "stand by" noticed a suspicious white, "four-door sedan with LED lights" outside of W.R.'s residence. As the

officer approached the vehicle, it sped out of the area. Attempts to locate the vehicle were unsuccessful.

During a canvass of W.R.'s neighborhood, law enforcement received information regarding a suspicious white vehicle that sped away from W.R.'s home on the day of the assault. A neighbor told officers that Prior had previously lived in the area. The neighbor stated that Prior drove a white Lexus sport utility vehicle with a damaged front quarter panel, that Prior would drive through the neighborhood at least two to three times per week, and that he had last seen Prior's vehicle at about 6 a.m. on October 18, 2017. The neighbor also provided law enforcement with two videos from his home surveillance camera: a video from October 17 at 6:15 a.m. and a second video from October 18 at 6:20 a.m. After determining that Prior was the registered owner of a white 2009 Lexus sport utility vehicle with Nebraska license plates, officers conducted an independent search into Prior and reviewed "field care interviews." One of those interviews led law enforcement to Jacquilyn B., who lived in W.R.'s neighborhood and had previously reported to law enforcement an interaction that she had had with Prior.

Based on W.R.'s description and Prior's resemblance to that description, officers presented W.R. with a photographic lineup containing six photographs, including one photograph of Prior. W.R. immediately eliminated three of the photographs, but was otherwise unable to affirmatively identify her assailant from the three remaining photographs. The three remaining photographs included the photograph of Prior. Following the photographic lineup, Prior was identified as a person of interest and law enforcement was instructed to be on the lookout for Prior and/or his white Lexus.

### 3. Vehicle Surveillance

On October 19, 2017, a deputy located Prior's Lexus in the parking lot of an apartment complex that was a short distance from W.R.'s home. Upon approaching the unoccupied Lexus, the deputy observed various items inside the vehicle,

including boltcutters, a brown wallet, binoculars, duct tape, a pair of women's underwear, leather work gloves, a "messenger type bag," white rope, water jugs, and a sleeping bag. While a search warrant of Prior's Lexus was obtained, Sgt. Greg Monico, along with another officer, conducted surveillance of the vehicle. During their surveillance, they heard branches snapping in the tree line behind them. The pair exited their vehicle, identified themselves as law enforcement, and ordered the individual to exit the tree line. Although the individual fled instead of complying with the officers' demands, the officers observed that the individual was wearing a "blue windbreaker style jacket," a head covering, dark-colored pants, and a knife sheath on his or her right side. After losing sight of the individual, officers called for backup, and during an approximately 10-minute time period, Prior's vehicle was not under surveillance. Despite having established a perimeter around the apartment complex, a "K-9" search of the area, and the search of a nearby creekbed, the individual was not located. After the search, the bottom of Monico's pants and his boots were soaked and muddy and cockleburs were stuck to his shoelaces.

After obtaining the warrant to search Prior's Lexus, law enforcement impounded the vehicle, searched it, and seized several pieces of white rope, condoms, two folding knives, blue nitrile gloves, metal handcuffs, a flashlight, a purse, a wallet, two pairs of black gloves, six pairs of glasses, binoculars, and a stethoscope. Law enforcement also took swabs of the steering wheel and gearshift and lifted a fingerprint from inside the vehicle.

### 4. Arrest

On October 20, 2017, Prior was arrested pursuant to a warrant at the home of his friend, Donovan Skow. Officers spoke to Skow and Kathy Higgins, who was also present. Skow told law enforcement that Prior stated that he was in trouble or that the police were after him due to the police's belief that Prior was stalking someone. Higgins reported that she was Prior's friend and that, during certain periods of time over

the previous month, he had been living with her. Higgins indicated that on October 20, she received a call from Prior asking for a ride because his vehicle had broken down. When she arrived, Higgins observed that Prior was wearing a black cap, had a knife sheath or holder, and looked "rugged, . . . tired, dirty, [and] muddy." She drove Prior to her home, and then she left to go to an appointment. When Higgins returned, she noticed that her apartment blinds were closed and that Prior had been watching the news about law enforcement's search for a suspect. Higgins also informed officers that some of Prior's personal property remained at her home even though he had not been living there for the previous week. She further stated that Prior had been using her red Chevrolet Aveo since October 20. During a search of the Aveo conducted pursuant to Higgin's consent, officers seized a pair of eyeglasses, a knife inside a black knife sheath, and wet and muddy dark-colored jeans that were consistent with the officers' description of the individual fleeing from the apartment complex on October 19. Officers also seized a black gaiter mask, which covers only the lower half of one's face, which was covered in cockleburs similar to those found on Monico's shoelaces after he searched the creekbed for the fleeing individual. During a search of Higgins' home to locate Prior's property, conducted pursuant to a warrant, officers seized a pair of gloves, 9-mm ammunition, several knives, and various jackets.

After Prior's arrest, he was booked into jail and strip searched. The deputy performing that search noted that Prior's "genitals [sic] region, testicles, shaft, and above the penis were all cleanly shaven. [Prior's] penis was circumcised and [he] had a small scar, approximately half an inch on the left hip."

## 5. Bag Located at Apartment Complex

On October 21, 2017, a resident of the same apartment complex where surveillance of Prior's Lexus had occurred noticed a bag by the garages of the complex and observed that no one had approached the bag during a 5-hour timeframe. The bag was located directly east of where the surveillance of

Prior's Lexus had occurred. The following day, after noticing the bag remained in the same place, the apartment complex resident grabbed the bottom of the bag and dumped out the contents. The contents of the bag included cigarettes, a black pouch, a flashlight, zip ties, white rope, a bandage wrap, "KY Jelly" lubricant, a 9-mm semiautomatic handgun loaded with ammunition, and Prior's driver's license and Social Security card. The apartment complex resident recognized Prior from news coverage regarding the commission of a crime and notified his father, who contacted law enforcement. At the time law enforcement responded to the call, Prior had already been taken into custody. The bag and its contents were collected as evidence and were tested for DNA.

### 6. Postarrest Interviews With Prior

Following Prior's October 20, 2017, arrest, police interviewed him two times. During the first interview, which occurred on October 20, Prior denied involvement and stated that on October 19, he was walking to stretch out his legs before going to sleep. Prior stated that he slept in his vehicle and that on the evening of October 19, someone approached his vehicle with a bag and took items from his vehicle, but fled when confronted by Prior. Prior told officers that he had noticed a large police presence in the area and decided not to go back to his vehicle that day.

During the second interview on October 22, 2017, which was conducted at Prior's request, Prior again denied involvement, but he stated that he had been distributing marijuana and stealing food from open garages. Prior confirmed that he previously resided in W.R.'s neighborhood and admitted to being in the area to drive by his mother's house. Prior repeated that he had noticed a large police presence on October 19, but added that he walked to a gas station where he called Higgins to request a ride. Prior acknowledged that he owned a white Lexus and that he returned to the apartment complex on October 20, but he denied having a bag or being in the woods near the apartment complex. During the second interview, after

granting Prior's request for a "smoke break," officers collected Prior's used cigarette butt to test it for DNA.

### 7. Search Warrant for Prior's Identifying Characteristics

In late October 2017, law enforcement sought a court order to obtain Prior's physical characteristics. In support of an ex parte court order allowing law enforcement to obtain identifying personal characteristics from Prior, including hair samples, digital voice recordings, and DNA evidence, the law enforcement officer's affidavit set forth the following facts: that Prior matched W.R.'s description of her assailant, that video surveillance and witness testimony had placed Prior in the area on the day of the assault, that items found inside the bag located at the apartment complex near W.R.'s residence included Prior's driver's license, and that evidence had been located containing Prior's DNA. The affidavit further set forth that W.R. had provided information regarding her assailant's identifying marks and characteristics and that, when Prior was arrested and booked into jail, officers noticed identifying characteristics similar to those described by W.R. The affidavit also stated that the officer believed that Prior would not willingly comply with a request to obtain evidence from his person because Prior had invoked his *Miranda* rights. After the court granted the request to obtain Prior's physical characteristics, law enforcement collected hair samples, buccal swabs, photographs, and other identifying characteristics from Prior.

### 8. Information and Pretrial Motions

In November 2017, the State charged Prior with 12 offenses related to the home invasion and sexual assault: count 1, first degree sexual assault; count 2, burglary; count 3, robbery; count 4, as amended, use of a firearm to commit a felony; count 5, first degree false imprisonment; count 6, possession of a firearm by a prohibited person; count 7, possession of a stolen firearm; count 8, terroristic threats; count 9, theft by receiving

stolen property; count 10, first degree trespass; count 11, theft by unlawful taking; and count 12, habitual criminal. Prior to the trial, the State dismissed count 7, possession of a stolen firearm, and count 9, theft by receiving stolen property.

### (a) Motions to Suppress

Before trial, Prior moved to suppress evidence, including the search of his bag, evidence obtained during the strip search of his person during the jail booking procedure, evidence obtained pursuant to the court's ex parte order requiring him to provide physical characteristics, and W.R.'s voice identification of Prior as her assailant. The parties entered into a limited stipulation as it related to Prior's motion to suppress W.R.'s voice identification of Prior. The stipulation indicated that W.R. attended pretrial hearings, during which she identified Prior as her assailant. The parties agreed that although the State was aware of W.R.'s presence at the pretrial hearing, neither the State nor law enforcement had requested W.R.'s attendance for the purpose of making an identification. Further, the State did not provide notice to Prior or defense counsel that W.R. would be attending the pretrial hearing.

The district court denied each of Prior's motions, including finding that Prior lacked standing to challenge the search of the bag because Prior had abandoned the bag and therefore did not have a reasonable expectation of privacy in the bag or its contents; that the strip search performed during the booking process was conducted pursuant to the Sarpy County sheriff's office's standard operating procedures (SOP), which procedures were reasonable to maintain the safety and security of those entering the facility and were closely tailored to prevent contraband from entering the facility; that the affidavit in support of the ex parte order established probable cause for the search warrant for Prior's person; that Prior was given a copy of the court order; and that any objection to the search was waived by Prior's consent. Regarding W.R.'s voice identification of Prior, the district court stated:

The manner and means of identification were not suggestive, and there is indicia of the reliability prior to in court identification, W.R. had ample opportunity to hear [Prior] speak. She was adequately able to describe the same to law enforcement as to the tone, inflection, and narrative of her assailant's voice. It occurred over a lengthy period of time. She has the requisite degree of attention and degree of certainty in the matter.

### (b) State's Motions in Limine

Prior to trial, the State filed motions in limine requesting a hearing to determine the admissibility of evidence concerning Prior's September 23, 2016, contact with Jacquilyn and his actions on October 13, 2017, related to Angelique C. The State alleged that Prior's contact with Jacquilyn and his October 13 actions

> may be considered admissible evidence under [Neb. Rev. Stat. §] 27-404 [(Supp. 2019)] and therefore a hearing is necessary for the State to provide proof of [Prior's] acts to demonstrate that said acts show proof of Prior's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, and are therefore admissible under [Neb. Rev. Stat. §] 27-401 [(Reissue 2016)] and/or 27-404.

Following a hearing, the court sustained the State's motions in limine, finding the evidence of Prior's previous conduct was admissible.

### (c) Motion to Secure Out-of-State Witnesses

In August 2020, Prior filed a motion to secure the attendance of three law enforcement officers from Kansas, alleging that they were material witnesses to Prior's defense. The affidavit by Prior's counsel suggested that each of the witnesses could testify regarding the similarities of the instant case to that of cases involving a serial rapist in Kansas and that this evidence would support Prior's claim that he was not the

perpetrator of the charged offenses. After reviewing the affidavit, the court overruled Prior's motion to secure the attendance of the requested witnesses.

## 9. TRIAL

The trial was held in September 2020. The State called 23 witnesses whose testimony was consistent with the facts laid out above. The State's witnesses included W.R., Jacquilyn, Angelique, and Monico. We describe short summaries of portions of the testimony of those individuals and the DNA evidence adduced by the State as it relates to specific assignments of error raised by Prior.

### (a) W.R.

W.R. testified consistent with the facts above and provided an in-court voice identification of Prior. On December 31, 2018, and July 1, 2020, W.R. attended two pretrial hearings open to the public related to the charges against Prior. Prior was not notified that W.R. was present at the hearings, but W.R. attended in order to prepare for the possibility of testifying at trial. During the December 2018 hearing, Prior, although represented by counsel, spoke. During the July 2020 hearing, Prior represented himself, but was assisted by standby counsel. W.R. testified that after hearing Prior speak during the pretrial hearings, she immediately recognized his voice as being the same voice she heard on the night of her assault. W.R. testified that she was "positive it's the same person" and that she would "never forget his voice."

### (b) Jacquilyn

Prior to Jacquilyn's testimony regarding her previous encounter with Prior, the court gave a limiting instruction that Jacquilyn's testimony was "not to prove the character of a person in order to show they acted in conformity with, but [the jury] may consider this for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge,

identity, or absence of mistake, or accident in this." Jacquilyn testified that she lived in the same area as W.R. When describing the September 23, 2016, encounter, Jacquilyn testified that as she returned home and pulled her vehicle into her garage, a white four-door Lexus pulled up behind her in her driveway. Jacquilyn testified that she exited her vehicle and met the individual in her driveway. The individual identified himself as Prior and provided her with a business card. During the conversation, Prior asked Jacquilyn several "uncomfortable personal questions" and told her that she needed to be more careful, notifying her and demonstrating to her that a side window to her home was unlocked. He offered to fix her broken doorbell and asked her how she protects herself. The encounter ended with Jacquilyn's calling the 911 emergency dispatch service. The State offered a recording of Jacquilyn's 911 call, which was received over Prior's objection.

(c) Angelique and Monico

Like Jacquilyn's testimony, Angelique's testimony was accompanied by a limiting instruction from the court. Angelique testified that on October 13, 2017, an unknown individual approached the back door of her home. Angelique had a doorbell security system, which is motion sensor activated and records when it senses movement. Angelique contacted law enforcement and provided them with the video taken from her doorbell security system. In the video, which was received and played over Prior's objection, an individual unsuccessfully attempted to open the back door of Angelique's home while wearing a mask around his neck. Monico identified Prior as the man depicted in the doorbell security video who attempted to open Angelique's door. Monico further testified that he recognized the bag that Prior had on his person in the doorbell security video as being the same bag as the one found at the apartment complex. Monico also identified the mask that Prior was wearing around his neck as being consistent with the gaiter mask located in Higgins' vehicle.

(d) DNA Evidence

During the trial, evidence was adduced regarding the results of DNA evidence obtained during the course of this case, including DNA obtained from the condom found at W.R.'s bedroom, rope found in Prior's vehicle, the gaiter mask found in Higgins' vehicle, and items found within the abandoned bag, including rope and black zip ties.

Regarding the DNA found on the condom, W.R. was not excluded as the major contributor and Prior was not excluded as a partial profile contributor. The State adduced evidence that the probability of an unrelated individual matching the profile consistent with W.R.'s profile was 1 in 187 octillion and that the probability of an unrelated individual matching the profile that is consistent with Prior's DNA profile was 1 in 251,000.

Regarding DNA found on the rope seized from Prior's vehicle, Prior was not excluded as the major contributor and W.R. was not excluded as a partial contributor. The State adduced evidence that the probability of an unrelated individual matching Prior's DNA profile was 1 in 239 septillion and that the probability of an unrelated individual matching W.R.'s profile was 1 in 2.33 billion.

Regarding DNA found on the gaiter mask, Prior was not excluded as a major contributor and W.R. was not excluded as a partial contributor. The probability of another individual matching Prior's profile was 1 in 761 octillion, and the probability of another individual matching W.R.'s profile was 1 in 504 million.

Regarding DNA found on items in the abandoned bag, neither Prior nor W.R. could be excluded as contributors of that DNA. The probability of another individual matching Prior's DNA profile was 1 in 761 octillion. Additionally, regarding the DNA found on the rope located inside the abandoned bag, W.R. was not excluded as a full profile contributor and the probability of another individual matching that same profile was 1 in 16.9 million. Regarding the DNA located on black

zip ties found in the abandoned bag, the probability that an unrelated individual would match Prior's DNA profile was 1 in 6.60 septillion and the probability that another individual would match W.R.'s profile was 1 in 1.75 trillion.

Finally, regarding DNA located on the 9-mm semiautomatic handgun, Prior and W.R. were not excluded as contributors. The probability of another individual matching the same DNA profile of Prior was 1 in 11.2 sextillion, and the probability of another individual matching the DNA profile of W.R. was 1 in 5.69 quadrillion. Prior's DNA was also obtained from the interior of the handgun, with a probability of another individual matching the same DNA profile being 1 in 761 octillion.

In sum, W.R. and Prior were included as possible contributors on the DNA collected from the condom located inside W.R.'s home on her bed; the white rope located on the floorboard of Prior's white Lexus; the black gaiter mask found in Higgins' vehicle; and the additional rope, black zip ties, and a 9-mm semiautomatic handgun located in the abandoned bag found at the apartment complex where Prior's vehicle was located. Additional items were tested and found to contain DNA consistent with Prior's DNA profile, including several items found inside that same bag and Prior's Lexus.

### 10. Jury Verdicts and Sentencing

Following the trial, the jury found Prior guilty of all nine charged offenses. Thereafter, the court determined that Prior was a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016) and proceeded to sentencing. The court reviewed the presentence investigation report for which Prior refused to provide any information. The district court considered the nature and circumstances underlying the crimes; the history, character and condition of Prior; the presentence investigation report, which included the victim impact statements; and the parties' arguments. The district court determined that a term of imprisonment was necessary for the protection of the public. The court imposed the following terms of imprisonment:

| Count | Offense | Sentence of Imprisonment |
|-------|---------|--------------------------|
| 1 | First Degree Sexual Assault | 45 to 50 years |
| 2 | Burglary | 15 to 20 years |
| 3 | Robbery | 20 to 30 years |
| 4 | Use of Firearm to Commit Felony | 45 to 50 years |
| 5 | First Degree False Imprisonment | 10 to 20 years |
| 6 | Possession of Firearm by Prohibited Person | 20 to 30 years |
| 8 | Terroristic Threats | 10 to 20 years |
| 10 | First Degree Trespass | 1 year |
| 11 | Theft by Unlawful Taking ($500 or less) | 6 months |

The court stated that each felony conviction "has been found to be enhanceable to the habitual criminal, which is [a] mandatory minimum of ten years that runs on the sentence. The sentence therefore is a period of 165 years to 220 years." The sentences on all counts were ordered to be served consecutively, Prior was granted 1,163 days' credit for time served, and he was ordered to comply with the Nebraska Sex Offender Registration Act. Prior has timely appealed to this court and is represented by the same counsel that represented him during his trial and sentencing.

## III. ASSIGNMENTS OF ERROR

Prior assigns, restated, that the district court erred in (1) finding that Prior lacked standing to challenge the search of his bag, because he had abandoned it; (2) overruling Prior's motion to suppress/motion in limine regarding voice identification; (3) allowing the State to adduce evidence of Prior's physical characteristics; (4) allowing Neb. Rev. Stat. § 27-404 (Supp. 2019) testimony of Jacquilyn and Angelique; (5) denying Prior's motion to secure out-of-state witnesses; (6) denying Prior's motion for directed verdict due to insufficiency of the evidence; and (7) imposing excessive sentences.

## IV. STANDARD OF REVIEW

[1] When reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth

Amendment, an appellate court applies a two-part standard of review. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Garcia, supra.*

[2] A trial court's finding that an item of personal property has been abandoned, and thus not subject to a reasonable expectation of privacy, is reviewed for clear error. See *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020).

[3] An appellate court reviews the admission of evidence of other acts under § 27-404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence outweighed its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted. *State v. Newman*, 4 Neb. App. 265, 541 N.W.2d 662 (1996).

[4,5] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Hassan*, 309 Neb. 644, 962 N.W.2d 210 (2021). The relevant question for an appellate court on review of the sufficiency of evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *State v. Garcia, supra*.

[6,7] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id*. In reviewing a sentence imposed within the statutory limits, an appellate court considers whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any legal principles in determining the sentence to be imposed. *State v. Rogers*, 297 Neb. 265, 899 N.W.2d 626 (2017).

[8] Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019).

## V. ANALYSIS

### 1. Standing to Challenge
### Search of Bag

Prior's first assigned error is that the district court erred in finding that he lacked standing to challenge the search of the bag found outside of the apartment complex, because the bag had been abandoned. He contends:

> The evidence is clear that [Prior] was arrested prior to the witnesses seeing the bag. The bag was full of [Prior's] personal items and in a place and location that he was going to return to in order to retrieve it. He clearly had a legitimate expectation of privacy in the invaded place with the only issue being whether or not he voluntarily abandoned it.

Brief for appellant at 16-17.

The State asserts that although defense counsel had discussions with the court at trial about continuing objections made in connection with his motion to suppress, Prior failed to make specific objections at appropriate times during the trial when certain contents of the bag were discussed by different witnesses. Assuming, without deciding, that Prior preserved his objection to the warrantless search of the bag at the time of trial, we address Prior's specific assignments that he retained

a legitimate expectation of privacy in the bag discovered which required a warrant to search the bag.

[9-11] The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution protect individuals against unreasonable searches and seizures by the government. *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014). However, when individuals voluntarily abandon property, they forfeit any expectation of privacy in the property that they might otherwise have had. *State v. Vasquez-Arenivar*, 18 Neb. App. 265, 779 N.W.2d 117 (2010). Because the Fourth Amendment does not protect voluntarily abandoned property, a warrantless search or seizure of abandoned property does not violate the Fourth Amendment. *State v. Vasquez-Arenivar, supra.* See, also, *State v. Dixon*, 306 Neb. 853, 947 N.W.2d 563 (2020) (once defendant abandons item of personal property making it available to police or public, defendant does not retain reasonable expectation of privacy in that property for purposes of Fourth Amendment protection).

[12-15] In adopting a framework for determining when property has been abandoned, the Nebraska Supreme Court reasoned and held as follows:

Both the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable searches and seizures. A search for Fourth Amendment purposes occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. But it is well-settled that once a defendant abandons an item of personal property and makes it available to the police or the public, he or she does not retain a reasonable expectation of privacy in the property for purposes of Fourth Amendment protection.

In [*U.S. v.*] *Basinski*, [226 F.3d 829 (7th Cir. 2000),] the Seventh Circuit held: "To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching

officer's position to believe that the defendant relinquished his property interests in the item searched or seized. . . . Because this is an objective test, it does not matter whether the defendant harbors a desire to later reclaim an item; we look solely to the external manifestations of his intent as judged by a reasonable person possessing the same knowledge available to the government agents. . . . We look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property."

*Basinski* also explained: "There are three general types of abandonment cases, which are based on these two indicia of abandonment. The first type is characterized by the presence of a fleeing defendant who relinquishes an object to make his flight easier or because discarding the item might make it easier for him to later claim that he never possessed it. . . . Because he has disposed of the property in a location that affords easy access to the public, a reasonable person would believe that the defendant's possessory interest in the property is so eroded that anyone has a right to retrieve it. The second type of case is closely related to the first, for in so-called 'garbage cases' the defendant places material in or near a refuse receptacle that is readily accessible to the public, and in which he usually places other discarded materials. . . . By this conduct and the location of the receptacle, the defendant leads reasonable people to believe that he no longer cares what becomes of his trash, or articles mistaken for trash. In the third type of case, the defendant is usually caught red-handed with or near a container of contraband, whereupon he denies that the container or its contents are his. . . . Taken at face value, this denial makes it reasonable to conclude that the defendant claims no possessory interest in the items."

Similarly, the Eighth Circuit explained in [*U.S. v.*] *Nowak*[, 825 F.3d 946 (8th Cir. 2016),] how courts are to determine when personal property is abandoned: "Whether property has been abandoned 'is determined on the basis of the objective facts available to the investigating officers, not on the basis of the owner's subjective intent.' . . . We consider the dual factors of whether the defendant physically relinquished his property and whether he denied ownership of it. . . . However, a verbal denial of ownership is not necessary for a finding of abandonment, and we reach our ultimate conclusion based on the totality of the circumstances." *Nowak* further held that "[w]hether property is discarded in a public, private, or semi-private place is a factor in considering whether the property has been abandoned . . . ."

We agree with the reasoning of *Basinski* and *Nowak*, and we adopt a similar test for determining abandonment. We now hold that to show abandonment of personal property for purposes of the Fourth Amendment, the State must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable officer to believe the defendant relinquished his or her property interests in the item. This is an objective test based on the information available to the officer, and the defendant's subjective intent to later reclaim the item is irrelevant. When determining whether property has been abandoned, courts consider the totality of the circumstances, and pay particular attention to the nature and location of any physical relinquishment of the property and any explicit denials of ownership. We note this test is, in substance, the test applied by the district court in this case.

*State v. Dixon*, 306 Neb. 853, 861-64, 947 N.W.2d 563, 571-73 (2020). See, also, *U.S. v. Sanders*, 130 F.3d 1316 (8th Cir. 1997) (holding that defendant's statements to officers that he did not own bag found on bus on which he was traveling constituted abandonment for purposes of Fourth Amendment).

After reviewing the record, we find that the circumstances attendant with the bag discovered by the apartment complex resident and reported to police meet the characteristics of two of the three general types of abandonment cases described by the Seventh Circuit and adopted by the Nebraska Supreme Court. First, the bag was located by the apartment complex resident, who was a member of the public, and the bag was in plain view, near the garages of an apartment complex. Having noticed the bag the previous day, the apartment complex resident then approached the bag and dumped out its contents in order to determine whether he could identify the owner. He noticed that the bag included Prior's driver's license and Social Security card and recognized Prior from news coverage regarding the commission of a crime. He notified his father, who contacted law enforcement. The location of the bag was near the area where police previously discovered Prior's vehicle and where they searched the woods after hearing someone in the woods who then fled from police. Under these circumstances, we find it reasonable for the police to conclude that the person who fled from them was Prior, who had relinquished the bag to make flight easier or because discarding the bag might make it easier for him to later claim that he never possessed it or its contents. Second, during one of Prior's postarrest interviews, he denied ownership of the bag police claimed was found near the area in which they had performed surveillance and located Prior's Lexus, making it reasonable to conclude that Prior claimed no possessory interest in the bag or its contents. Under these circumstances, we find the court did not clearly err in finding that the State provided, by a preponderance of the evidence, that Prior had abandoned the bag and in denying Prior's motion to suppress. This assignment of error fails.

## 2. Motion to Suppress Voice Identification

Prior next asserts that the district court erred in overruling his motion to suppress W.R.'s pretrial voice identification of him as her assailant, which identification occurred during

a pretrial hearing. In his motion to suppress, Prior asserted that W.R.'s voice identification of him was improper and violated his right to due process and his Sixth Amendment right to counsel. The district court overruled his objection and allowed W.R. to testify to having recognized Prior's voice as the voice of her assailant when she heard him speak at the pretrial hearings.

[16] On appeal, Prior assigned error to this ruling, but he also now asserts that the identification violated his Fifth Amendment right against self-incrimination. As we have long held, an objection must be specifically stated, and on appeal, a defendant may not assert a different ground for his or her objection to the admission of evidence than was offered to the trier of fact. *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021). Accordingly, we decline to address Prior's claim regarding a violation of his Fifth Amendment right against self-incrimination.

In asserting his due process and Sixth Amendment claim, Prior focuses on *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), which held that postindictment identification procedures arranged by law enforcement—conducted without notice to, and in the absence of, defense counsel—were violative of the Sixth Amendment right to counsel. Prior presents no argument that W.R.'s identification of his voice involved an unnecessarily suggestive procedure or that it lacked reliability. As such, we narrowly examine Prior's specific claim that the pretrial voice identification process violated Prior's Sixth Amendment right to counsel.

In *United States v. Wade, supra*, the U.S. Supreme Court addressed the question of whether courtroom identifications at trial should be excluded when the accused was exhibited to the witness before trial at a postindictment lineup conducted for identification purposes without notice to, and in the absence of, the accused's appointed counsel. In analyzing the dangers associated with postindictment lineups conducted for identification purposes without counsel, the U.S. Supreme Court stated:

Williams & Hammelmann, in one of the most comprehensive studies of such forms of identification, said, "[T]he fact that the police themselves have, in a given case, little or no doubt that the man put up for identification has committed the offense, and that their chief pre-occupation is with the problem of getting sufficient proof, because he has not 'come clean,' involves a danger that this persuasion may communicate itself even in a doubtful case to the witness in some way . . . ." Identification Parades, Part I, [1963] Crim. L. Rev. 479, 483.

*United States v. Wade*, 388 U.S. at 235. In so finding, the U.S. Supreme Court ultimately held:

Since it appears that there is grave potential for prejudice, intentional or not, in the pretrial lineup, which may not be capable of reconstruction at trial, and since presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial, there can be little doubt that for [the defendant] the postindictment lineup was a critical stage of the prosecution at which he was "as much entitled to such aid [of counsel] . . . as at the trial itself." *Powell v. Alabama*, 287 U. S. 45, 57.

*United States v. Wade*, 388 U.S. at 236-37.

Prior suggests that the U.S. Supreme Court's holding in *Wade* should apply to W.R.'s voice identification of him, which did not involve a state or police organized lineup or voice identification procedure. We disagree that such an extension is warranted on the facts of this record.

[17,18] The U.S. Supreme Court's holding in *Wade* was premised upon the concern of undue suggestion associated with the conduct of a state or police in connection with such organized practices. But as the Nebraska Supreme Court held in *State v. Nolan*, 283 Neb. 50, 63, 807 N.W.2d 520, 535 (2012):

Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed

by the corrupting effect of improper police conduct. When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.

Here, W.R.'s voice identification of Prior was not the result of an identification procedure arranged by law enforcement. W.R. attended a public pretrial hearing of her own volition. Under these circumstances, the dangers suggested by the U.S. Supreme Court in *Wade*, which entitled the defendant the right to have counsel present, were not at issue here. Because no improper law enforcement activity was involved, it was sufficient to test the reliability of W.R.'s identification testimony at trial. We further note that Prior's counsel, acting as either counsel or standby counsel, was in attendance at both of these hearings. Prior's claim that the court erred in failing to suppress W.R.'s voice identification testimony procured through her voluntary attendance at a pretrial hearing not arranged by law enforcement fails.

### 3. Denial of Motion to Suppress
### Physical Characteristics

Next, Prior alleges that the district court erred in overruling his motion to suppress evidence of his personal characteristics which were obtained (1) during a strip search of his person when he was booked into the Sarpy County jail (Prior claims that police did not follow the SOP) and (2) pursuant to a second search conducted in connection with the district court's October 24, 2017, ex parte order (Prior claims other abnormalities). We note that Prior's assignment of error relates only to law enforcement's obtaining his physical characteristics, not samples of his hair or DNA. The State again argues that this assigned error was not preserved notwithstanding the general discussion about preserving objections made in Prior's

motions to suppress. Assuming, without deciding, that this error was properly preserved, we consider it.

Prior first simply argues that

the Court erred in allowing the physical characteristics taken pursuant to the strip search of [Prior] when he was booked into the Sarpy County Jail. In [its] Order, the Court found that the policies and procedures allowed said identifying characteristics to be taken. However, this was in contravention of the actual policy.

Brief for appellant at 28. We disagree. A copy of the SOP was admitted into evidence. The SOP explicitly states that if an inmate "is charged with a crime of violence, escape, burglary, or use of a weapon," it provides reasonable suspicion for strip searches at admission to the jail. Prior was arrested and charged with multiple crimes, including first degree sexual assault, burglary, and use of a weapon to commit a felony. These charges provided reasonable suspicion for law enforcement to strip search Prior upon booking him into jail. Section IV(D)(6)(f) of the SOP provides that during a strip search,

[t]he employee shall visually inspect the inmate for contraband and/or any identifying scars, marks or tattoos, and/or any evidence of contagious disease. Areas to be inspected shall include:

(1) Hair, ears, mouth, and nose
(2) Arms, armpits, and hands
(3) Abdomen, breasts, back, legs, and feet
(4) Outer genital and anal areas.

The deputy that conducted the strip search of Prior in connection with Prior's booking noted the key physical characteristics on Prior's stomach and groin area that were described by W.R. as being present on her assailant. Because the SOP explicitly authorized the deputy conducting the strip search to identify such personal characteristics, Prior's argument that they were identified in contravention of this policy fails.

Prior next argues that the court should have suppressed his physical characteristics obtained pursuant to the separate

search conducted in connection with the court's ex parte order for abnormalities associated with procurement of that order. Neb. Rev. Stat. § 29-3302 (Reissue 2016) provides:

> Judges and magistrates may issue orders authorizing identification procedures for the purpose of obtaining identifying physical characteristics in accordance with the procedures specified in sections 29-3301 to 29-3307. An order may be issued by any judge of the district court, Court of Appeals, or Supreme Court for service and execution anywhere within the State of Nebraska. An order may also be issued by any judge of the county court or other magistrate for service within the county of issuance.

However, Neb. Rev. Stat. § 29-3304 (Reissue 2016) provides:

> No order shall be required or necessary where the individual has been lawfully arrested, nor under any circumstances where peace officers may otherwise lawfully require or request the individual to provide evidence of identifying physical characteristics, and no order shall be required in the course of trials or other judicial proceedings.

Prior argues that in procuring the order under § 29-3302, the State failed to show that Prior would have failed to provide the desired evidence and that there was no evidence indicating a copy of the order was given to him at the time it was executed. But Prior's argument fails for two reasons. First, the physical evidence was lawfully obtained from the strip search associated with Prior's booking, making it unnecessary to further obtain this authority under § 29-3302. That concept is captured by § 29-3304, which explicitly provides that no order is required or necessary where the individual has been lawfully arrested or under circumstances where peace officers otherwise lawfully require or request the individual to provide evidence of such characteristics. Because Prior was arrested and the SOP lawfully allowed the strip search in which Prior's physical characteristics could be, and were, identified, the

separate ex parte order was unnecessary and the abnormalities suggested by Prior were of no consequence.

[19] Second, Prior's claim of abnormality in not requesting permission to review his physical characteristics before seeking an order or serving him with a copy of the order are without consequence. Assuming, without deciding, that Prior would have consented to the search without the order or that a copy of the order was not presented to him upon execution, we determine that neither circumstance would have resulted in the State's failing to procure the physical attributes complained of. We fail to see how Prior's argument that he would have consented to the search without an order would somehow bar evidence procured with an order or which was otherwise validly obtained through the strip search conducted before. Appellate courts will not reverse a criminal conviction in the absence of prejudice to the defendant. *State v. Kirby*, 198 Neb. 646, 254 N.W.2d 424 (1977). This argument fails.

### 4. Testimony of Jacquilyn and Angelique

Prior next assigns that the district court erred in allowing the testimony of Jacquilyn and Angelique, which was a violation of § 27-404.

[20] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Hill*, 298 Neb. 675, 905 N.W.2d 668 (2018).

[21,22] A trial court has the discretion to determine the relevancy and admissibility of evidence, and such determinations will not be disturbed on appeal unless they constitute an abuse of that discretion. *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020). Additionally, it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Newman*, 4 Neb. App. 265, 541 N.W.2d 662 (1996) (abuse of judicial

discretion means that reasons or rulings of trial court are clearly untenable, unfairly depriving litigant of substantial right and denying just result in matters submitted for disposition).

[23] An appellate court reviews the admission of evidence of other acts by considering whether the evidence was relevant, whether the evidence had a proper purpose, whether the probative value of the evidence outweighed its potential for unfair prejudice, and whether the trial court, if requested, instructed the jury to consider the evidence only for the purpose for which it was admitted. *Id*.

Section 27-404 provides, in pertinent part:

(1) Evidence of a person's character or a trait of his or her character is not admissible for the purpose of proving that he or she acted in conformity therewith on a particular occasion, except:

(a) Evidence of a pertinent trait of his or her character offered by an accused, or by the prosecution to rebut the same;

(b) Evidence of a pertinent trait of character of the victim of the crime offered by an accused or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor. In a sexual assault case, reputation, opinion, or other evidence of past sexual behavior of the victim is governed by section 27-412; or

(c) Evidence of the character of a witness as provided in sections 27-607 to 27-609.

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes,

wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

Here, the State filed a motion in limine to determine the admissibility of the testimony of Jacquilyn and Angelique under § 27-404. In connection with the motion, the State argued that the events described by Jacquilyn and Angelique should be admissible because they provided evidence of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident as allowed under § 27-404(2). The court found that the testimony as to Jacquilyn was admissible as relevant to show motive, opportunity, and/or intent, preparation, or plan. Further, the court found that the probative value of the evidence outweighed any prejudicial effect. Likewise, the court found that the testimony of Angelique was admissible given the location of the events which occurred and the nature of the circumstances to show proof of motive, opportunity, intent, preparation, plan, and identity, and that the value of the testimony was not outweighed by the prejudicial effect.

At trial, Jacquilyn and Angelique testified about encounters they had experienced with Prior. Jacquilyn testified that as she drove her vehicle into her garage, Prior pulled up his Lexus behind her in her driveway and began asking her questions that made her feel uncomfortable. Jacquilyn testified to Prior's indicating that her back doorbell was broken and that her window was unlocked. He asked her how she protects herself. Jacquilyn then called 911 to report the encounter. Angelique testified that an individual, later identified by police as Prior, attempted to open her back door 6 days prior to the home invasion robbery and sexual assault of W.R. Angelique's doorbell security camera captured the attempt on video, and the police were contacted. The officers were able to identify Prior and noticed a bag similar to the one described by W.R. The State offered this evidence for a limited purpose, and the

court accompanied the testimony with limiting instructions that it was not to be used to show propensity character evidence. Prior argues that under § 27-404(2), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith." Although Prior acknowledges the remainder of § 27-404(2) provides that "[i]t may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," he argues that the testimony amounted to propensity evidence and was not admissible for another purpose.

Section 27-404 is a rule of inclusion, as opposed to exclusion, and permits the use of other relevant acts for purposes other than to prove that the person acted in conformity with their prior acts. See *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). This court has held:

> In the case at hand, the trial court instructed the jury that [testimony by two individuals] was to be received for the limited purpose of placing [the defendant] in the area described on the date and time described, and for no other purpose. We find that not only could the evidence be admitted for that limited purpose, but it could also be introduced for purposes of establishing identity and planning. [The defendant's] only defense was that the victim identified the wrong man as her assailant. Placing [the defendant] within blocks of the crime, within hours of the crime, seemingly stalking one woman to her apartment building and approaching another woman near another apartment building, is relevant to the sexual assault of the victim, and therefore there was no abuse of discretion by the trial court in admitting the evidence.

*State v. Newman*, 4 Neb. App. 265, 281, 541 N.W.2d 662, 674 (1996).

Similar to the evidence in *Newman*, the evidence of the prior actions described by Jacquilyn and Angelique were

relevant and admissible because they placed Prior in the same neighborhood as W.R. within a relevant timeframe, performing similar acts of unauthorized attempted entry into the homes of females in the area, in opposition to Prior's stated defense of misidentification. This testimony provides evidence of identity and planning, thereby rendering it relevant to this specific charge. Nor do we find that this relevant evidence was unfairly prejudicial to Prior. The district court did not abuse its discretion in admitting testimony from both Jacquilyn and Angelique.

### 5. DENIAL OF REQUEST TO SECURE OUT-OF-STATE WITNESSES

In his next assignment of error, Prior contends that the district court erred in overruling his motion to secure three out-of-state witnesses for his defense.

Neb. Rev. Stat. § 29-1908 (Reissue 2016), which governs the court's ability to secure out-of-state witnesses, provides in part:

> If a person in any state, which by its laws has made provision for commanding persons within its borders to attend and testify in criminal prosecutions, or grand jury investigations commenced or about to commence, in this state, is a material witness in a prosecution pending in a court of record in this state, or in a grand jury investigation which has commenced or is about to commence, a judge of such court may issue a certificate under the seal of the court stating these facts and specifying the number of days the witness will be required.

[24,25] Process to secure attendance of witnesses from another state may not be issued unless the testimony proposed to be elicited from such witnesses is relevant to the issues to be tried. *State v. Casados*, 201 Neb. 726, 271 N.W.2d 849 (1978). It is proper to sustain a motion in limine to prevent reference to or the offer of evidence concerning matters which are entirely extraneous or irrelevant to the issues of the case. *Id.*

Here, Prior filed a motion to secure the attendance of three law enforcement officers from Kansas. In the motion, Prior contended that the witnesses were material and requested that the court order them to attend and testify at trial. At the hearing on the motion, Prior explained that the witnesses would be able to testify regarding a series of rapes that had occurred in Kansas. The court requested that Prior submit an affidavit regarding how the witnesses were material. After receiving the affidavit, the court overruled the motion.

After reviewing the affidavit provided by Prior's counsel to the court in support of his motion to secure the attendance of the three Kansas law enforcement officers, we agree with the district court that Prior failed to demonstrate the officers would provide relevant testimony of matters which were not extraneous to the case. In reaching that conclusion, we note that within the affidavit, Prior's counsel failed to provide any evidence that the alleged Kansas serial rapist had ever been found to act outside of that state, that there was no testimony the alleged Kansas rapist had any physical characteristics similar to those described by W.R., and that the affiant was lacking in any specific evidence that could be considered exculpatory of Prior.

In addition, in *State v. Cain*, 223 Neb. 796, 393 N.W.2d 727 (1986), the Nebraska Supreme Court stated that a denial of defendant's request for subpoenas to compel attendance of witnesses expected to testify to a police informant's alleged prior use of drugs was harmless beyond a reasonable doubt, where tape recordings provided overwhelming evidence of defendant's violations of controlled substance laws. Likewise, even if the testimony sought by Prior by his motion could have been found to be somehow relevant to Prior's defense, overruling the motion to secure the witnesses' attendance was harmless error due to the overwhelming amount of evidence of Prior's guilt, including, but not limited to, the DNA evidence linking Prior to the assault, testimony that Prior was seen in the area on both days the assault took place, video surveillance which

captured Prior's vehicle in the area, a voice identification of Prior by W.R., evidence of Prior's physical characteristics consistent with W.R.'s description of her assailant, evidence that Prior had been involved in at least two reported prior interactions in the area over the last year, evidence that W.R.'s assailant smelled of cigarette smoke accompanied by evidence that Prior smoked cigarettes, and the physical evidence collected from Prior's vehicle, Higgins' home and vehicle, and Prior's abandoned bag. Even if we found that the district court erred in failing to grant Prior's motion for out-of-state witnesses, such error was harmless. This assigned error fails.

## 6. Denial of Motion for Directed Verdict

Prior alleges that the district court erred when it denied his motion for a directed verdict based on the insufficiency of the evidence. He contends that the State's case was based upon circumstantial evidence, the State's DNA evidence was weak, and the court "was swayed by emotion and sympathy and not enough hard evidence to find [Prior] guilty beyond a reasonable doubt." Brief for appellant at 38.

[26] In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Duncan*, 293 Neb. 359, 878 N.W.2d 363 (2016). If there is any evidence which will sustain a finding for the party against whom a motion for directed verdict is made, the case may not be decided as a matter of law, and a verdict may not be directed. *Id*.

Here, the State presented evidence from W.R. regarding the offenses and the description of the perpetrator. W.R. identified Prior's voice as the voice of her assailant, stating she was "positive" that it was the same individual and that she "would never forget that voice." Video evidence and witness testimony placed Prior near the area on the day that W.R.

was assaulted, and the abandoned bag included items match-
ing the description of items used during the assault of W.R.
Additionally, Prior could not be excluded as a contributor of
DNA evidence collected at the crime scene, located in the
abandoned bag, and located in both Prior's vehicle and the
vehicle he had borrowed from Higgins in the days preceding
his arrest. Further, W.R.'s DNA was found on items located
in Prior's bag. Viewing this evidence presented in the light
most favorable to the State, a reasonable trier of fact could
have found the State proved the elements of the charged
offenses beyond a reasonable doubt. Since there was evidence
to sustain a finding for the State, the district court properly
denied Prior's motion for a directed verdict. This assignment of
error fails.

### 7. Excessive Sentences

Prior's final assignment of error is that the sentences
imposed were excessive. Specifically, he contends that the
district court abused its discretion (a) by failing to give proper
weight and consideration to sentencing factors and (b) in
imposing consecutive sentences because his offenses, although
each having unique requirements, all stemmed from the same
set of facts.

### (a) Consideration of Sentencing Factors

Before addressing Prior's claim that the district court abused
its discretion by failing to give proper weight and consid-
eration to sentencing factors, we review Prior's convictions
and sentences imposed. Prior was convicted of seven felonies
and two misdemeanors. The court determined that Prior was
a habitual criminal and sentenced him on his felony convic-
tions pursuant to § 29-2221, which requires a mandatory
minimum of 10 years' imprisonment and a maximum of 60
years' imprisonment.

Prior was convicted of seven felonies and sentenced as
follows: 45 to 50 years' imprisonment for first degree sexual
assault, 15 to 20 years' imprisonment for burglary, 20 to 30

years' imprisonment for robbery, 45 to 50 years' imprisonment for use of a firearm to commit a felony, 10 to 20 years' imprisonment for first degree false imprisonment, 20 to 30 years' imprisonment for possession of a firearm by a prohibited person, and 10 to 20 years' imprisonment for terroristic threats. See, Neb. Rev. Stat. § 28-319 (Reissue 2016) (first degree sexual assault); Neb. Rev. Stat. § 28-507 (Reissue 2016) (burglary); Neb. Rev. Stat. § 28-324 (Reissue 2016) (robbery); Neb. Rev. Stat. § 28-1205 (Reissue 2016) (use of firearm to commit felony); Neb. Rev. Stat. § 28-314 (Reissue 2016) (first degree false imprisonment); Neb. Rev. Stat. § 28-1206 (Supp. 2017) (possession of firearm by prohibited person); Neb. Rev. Stat. § 28-311.01 (Reissue 2016) (terroristic threats). Each of these sentences is within the enhanced sentencing range set by the habitual criminal statute of a mandatory minimum of 10 years' imprisonment to a maximum of 60 years' imprisonment. See § 29-2221(1). We note that pursuant to § 29-2221, each of these sentences has a mandatory minimum of 10 years' imprisonment.

Regarding Prior's misdemeanor convictions, the court sentenced Prior to 1 year's imprisonment for his conviction of first degree trespass, which is within the statutory sentencing range for Class I misdemeanors that are punishable by a minimum of no imprisonment to a maximum of 1 year's imprisonment, a $1,000 fine, or both. See Neb. Rev. Stat. § 28-106 (Reissue 2016); Neb. Rev. Stat. § 28-520 (Reissue 2016) (first degree trespass). The court sentenced Prior to 6 months' imprisonment for his conviction of theft by unlawful taking ($500 or less), which is within the statutory sentencing range for Class II misdemeanors of a minimum of no imprisonment and a maximum of 6 months' imprisonment, a $1,000 fine, or both. See, § 28-106; Neb. Rev. Stat. § 28-511 (Reissue 2016) (theft by unlawful taking or disposition); Neb. Rev. Stat. § 28-518(4) (Reissue 2016) (grading of theft offenses).

[27,28] Because the sentences imposed were within statutory limits, we review the sentences imposed for an abuse of

discretion. See *State v. Russell*, 292 Neb. 501, 874 N.W.2d 8 (2016). When imposing a sentence, a sentencing judge should customarily consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). However, the sentencing court is not limited to any mathematically applied set of factors. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

Here, the district court considered the serious nature and circumstances of the offenses; Prior's history, character, and condition; the information contained in the presentence investigation report; and statements received by the court, including the victim impact statement. The court noted that Prior was 56 years old, was "separated," had obtained a diploma through the GED program, and was unemployed due to his incarceration. Prior's criminal history includes convictions of three counts of burglary, two counts of robbery, and one count of second degree forgery. The court did not have any "LS/CMI" scorings because Prior failed to complete his paperwork for the presentence investigation. The district court determined that a term of imprisonment was necessary for the protection of the public. An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019).

In sum, we determine the district court did not abuse its discretion in imposing the sentences. This determination is based upon the following factors: the district court's imposition of sentences that were within the appropriate statutory sentencing ranges as enhanced under the habitual criminal statute;

the district court's consideration of appropriate factors; Prior's criminal history; Prior's failure to take responsibility for the offenses; the seriousness of the offenses; and the physical, mental, and emotional injuries sustained by the victim.

### (b) Imposition of Consecutive Sentences

Prior also contends that the district court erred in imposing consecutive, rather than concurrent, sentences and that by doing so, the district court was "overly punitive" in ordering all the sentences to be served consecutively. Brief for appellant at 41. Prior claims that his convictions, although each having "their own unique requirements . . . are all part of the overall crime. At some point, the [district court] is just piling on time when it runs [the sentences] all consecutively." *Id.* at 40.

Generally, it is within a trial court's discretion to direct that sentences imposed for separate crimes be served either concurrently or consecutively. *State v. Brown*, 302 Neb. 53, 921 N.W.2d 804 (2019). As Prior acknowledges in his brief, each of the offenses for which he stands convicted have "their own unique requirements," or stated another way, Prior's convictions involve separate elements even though they were part of the same series of events. The district court therefore had the discretion to impose consecutive sentences, and it did not abuse its discretion in doing so. Prior's claim that his sentences were excessive fails.

### VI. CONCLUSION

For the reasons stated above, we affirm Prior's convictions and sentences.

AFFIRMED.